## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## GREYHOUND LINES, INC., Respondent.

### No. 80–2170.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 12, 1981.

Decided Sept. 25, 1981.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Allison W. Brown, Jr., Michael G. Okun, argued, Attys., N.L.R.B., Washington, D.C., for petitioner.

John L. Johnson, argued, Atty., The Greyhound Corp., Phoenix, Ariz., for respondent.

Before HENLEY and ARNOLD, Circuit Judges, and BECKER,* Senior District Judge.

HENLEY, Circuit Judge.

This case is before the court on application of the NLRB for enforcement of its order against Greyhound Lines, Inc. (the Company), based on findings that Greyhound violated Section 8(a)(1) of the National Labor Relations Act of 1947 (the Act), as amended, 29 U.S.C. § 151 *et seq.*, by suspending two employees, Benner and Jenson, because they issued a press release announcing the intent of employee drivers to strictly obey the speed limit over the Labor Day weekend.

Benner, one of the Company's drivers and a local union official in Minneapolis, met with other drivers at a rest stop in Wisconsin in mid-July, 1979. The drivers discussed the pressures they were experiencing meeting time schedules under the new 55 mile-per-hour speed limit. They also discussed a recent company announcement, rescinded shortly thereafter, that three new driver jobs would require successful bidders to work seven days a week without overtime pay. They considered the possibility of adhering without exception to the 55 m.p.h. speed limit over the Labor Day weekend to protest these matters. Benner later discussed this idea with Jenson, a union steward based in Minneapolis, but no action was taken at that time.

On August 7, Benner noticed a letter on the drivers' bulletin board urging support for a group of approximately forty Salt Lake City drivers who had received discharge notices as a result of a wildcat strike. Thinking that this might rekindle interest in the "slowdown," Benner and Jenson, after a brief investigation, concluded that drivers approved the proposed action. On August 20 or 21, they prepared an interview-type press release announcing a planned observance of the 55 m.p.h. speed limit over the Labor Day weekend. On August 25, Benner saw another posted letter concerning the dismissal of the Salt Lake drivers. Benner contacted people who were said to have confirmed the information in both letters although, in fact, only six of the drivers were actually dismissed and they were later reinstated with suspensions. On August 26, Benner distributed the following press release to the media:

Head: GREYHOUND DRIVERS TO SET LABOR DAY PACE

Greyhound drivers nationwide will drive strictly within the 55 mile-per-hour speed limit through the Labor-Day weekend to save fuel and set an example for other drivers.

Several members of the State Highway Patrols have commended the drivers for this effort.

It is well known that on rare occasions Greyhound drivers will slip over the 55 mph limit to accommodate their passengers after departure delays, bus breakdowns, inclement weather and other unexpected delays.

Veteran-driver and Union Steward, Jerry Jenson said "over 350 drivers interviewed last week from coast to coast unanimously supported the plan which is expected to result in some connecting departure delays."

Jensen declined to comment when asked if the "Slowdown" had anything to do with a recent attempt to work regular-run drivers seven days a week without overtime, the dismissal of 36 drivers three weeks ago in Salt Lake City who were protesting alleged contract violations, or with Greyhound's numerous runs that are impossible to operate within the 55-mph speed limit.

On September 6, Benner and Jenson received disciplinary notices with fourteen-day suspensions for "words or acts of hostility to the Company, or words or acts which result in damage to the Company's reputation, property or services and for divulging affairs of the Company without approval."

---

* The Honorable William H. Becker, United States Senior District Judge, Western District of Missouri, sitting by designation.

The NLRB issued a complaint on October 12, 1979, charging respondent with violations of Section 8(a)(1) of the Act. On September 8, 1980, the Board affirmed the findings and conclusions of the ALJ that the Company, by disciplining Benner and Jenson, had violated Section 8(a)(1) of the Act. The Board further adopted the ALJ's order to cease and desist the unfair labor practice, rescind the disciplinary notices, award back pay to Benner and Jenson, and post an appropriate notice. In resisting enforcement of this order, the Company contends that the Board's finding that respondent violated Section 8(a)(1) is not supported by substantial evidence on the record as a whole.

In discussing respondent's contention, we must bear in mind the proper standard of review, as stated by this court in *NLRB v. Brown & Root, Inc.*, 311 F.2d 447 (8th Cir. 1963).

> It is not the function of this Court to try the case de novo or to substitute its own appraisal of the evidence for that of the Board. If the Board has conceived the law correctly, if it has not acted arbitrarily or capriciously, and if its findings are supported by 'substantial evidence on the record considered as a whole,' they are conclusive and binding on this Court even though we might have made different findings upon an independent consideration of the same evidence.

311 F.2d at 451, *citing* 29 U.S.C. § 160(e) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *See Osceola County Co-Operative Creamery Ass'n v. NLRB*, 251 F.2d 62, 63–64 (8th Cir. 1958).

It is argued by respondent that not all concerted activity is protected by Section 7. Among the unprotected categories of activities are those "characterized as 'indefensible' because they . . . show a disloyalty to the workers' employer which . . . [is] unnecessary to carry on the workers' legitimate concerted activities." *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962). *See NLRB v. Local Union No. 1229 (IBEW)*, 346 U.S. 464,

477, 74 S.Ct. 172, 179, 98 L.Ed. 195 (1953). Respondent concedes that employee communications to the public may be protected, that is, "defensible," if they are directly related to an ongoing labor dispute, are not a disparagement of the Company's reputation or the quality of the Company's product, and are not maliciously motivated. *See Local 1229, supra; Allied Aviation Service Co. of New Jersey, Inc.*, 248 N.L.R.B. No. 26, 103 L.R.R.M. 1454 (1980), *enf'd*, 636 F.2d 1210 (3d Cir. 1980); *Stephens Institute*, 241 N.L.R.B. No. 133, 101 L.R.R.M. 1052 (1979). It is respondent's position that the press release issued by Benner and Jenson does not fall within this range of protected communications.

First, respondent argues that there was no ongoing labor dispute. There was no evidence that any grievance had been filed, although grievance procedures under the collective bargaining agreement were in effect at that time. However, there were statements by the Board that Benner had complained unsuccessfully to the Company on several occasions regarding the schedule problems. 29 U.S.C. § 152(9) defines labor dispute as including *"any controversy* concerning terms, tenure or conditions of employment." (Emphasis added.) Given this broad definition, we conclude that the Board's finding is supported by the evidence of discussions and actions preceding and in preparation for the proposed "slowdown" over the Labor Day weekend in protest of company policies and actions.

Second, respondent contends that even if there existed an ongoing labor dispute, the press release was not a communication directly related to the dispute and was therefore unprotected. The reason stated in the press release itself for the "slowdown" was to save fuel and set an example. Respondent submits that the only reference in the press release of employee grievances was in the fifth paragraph and that Jenson's refusal to comment on the matters mentioned therein should not be considered a "communication" relating to the dispute. The Board, however, takes the position that by refusing to comment, Jenson was indirectly

conveying the employees' message that the proposed "slowdown" was, in fact, a protest against the enumerated company actions and policies.

In *Allied Aviation*, the Board stated that "the touchstone [is] not whether the communication constituted a virtual carbon copy of the specific arguments raised with the respondent, but [is], rather, whether the communication was *a part of and related to* the ongoing labor dispute." 103 L.R.R.M. at 1456 (emphasis in original). Regardless of the reasons stated in the release itself, it is clear from the discussions and actions preceding the release that the "slowdown" was in protest of the enumerated grievances, and it is likely that the reference to the grievances in the last paragraph of the release would suggest such a relationship to the reader. We therefore find substantial evidence to support the Board's finding that the press release was related to the ongoing dispute.

Third, respondent contends that the press release constituted a public disparagement of the Company's product and reputation and was therefore unprotected. *See Local 1229*, 346 U.S. at 474, 74 S.Ct. at 177; *Allied Aviation*, 103 L.R.R.M. at 1456. Respondent asserts that the statement regarding expected connecting departure delays indicates to the public that Greyhound's service would be inadequate over the holiday weekend. The press release also implies that Greyhound condones or encourages exceeding the speed limit in order to avoid or to minimize delays, although, in fact, Greyhound provides in the Drivers' Rule Book that drivers must obey all posted speed limits and *"[w]hen late, stay late."* (Emphasis in Rule Book.) Respondent argues that the statements and accompanying insinuations constitute a disparagement of Greyhound's services and reputation.

The Board, on the other hand, characterized the reference to expected delays as a simple statement that, as a result of the drivers' strict observance of the speed limit to protest the Company's actions, some delays might occur. The Board found that the release did not contain any insults or negative insinuations about the Company's services or integrity with respect to its customers.

In comparing the statements in the press release to others that have been found protected and unprotected, we cannot disagree with the Board's finding that the statements fall short of an unprotected disparagement. *Compare Allied Aviation, supra* (letters to customers that employer's procedures were unsafe, protected), and *Community Hospital of Roanoke Valley, Inc. v. NLRB*, 538 F.2d 607 (4th Cir. 1976) (statement in television interview that hospital was understaffed, protected), *with Local 1229, supra* (handbills criticizing employer's local programming, unprotected).

Finally, respondent argues that the release is not protected because it was maliciously motivated. *See Allied Aviation*, 103 L.R.R.M. at 1456. As evidence of malice, respondent relies on Benner's statement that "things would really be screwed up if we held to 55 for any period of time." Respondent also points out that the press release contained false statements regarding the alleged dismissal of the Salt Lake drivers and the seven-day work week proposal, which had been rescinded before the release. This disregard for the truth, respondent contends, is additional evidence of Benner's and Jenson's malicious motive.

The Board again viewed the actions challenged by respondent in a different light. Benner's statement was interpreted as merely a prediction of the potential effectiveness of the proposed "slowdown" rather than as evidence of an intent to harm the Company. The Board further found that Benner had attempted to confirm the dismissal of the Salt Lake drivers and was relying on the information he had received from people in Salt Lake City. We cannot say the Board's finding of no malicious motive is not supported by the record.

We recognize that the "lines defining [Section 7 rights] have of necessity been painted with broad strokes." *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1347 (3d Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). Neverthe-

less, upon a de novo review of the circumstances in this case, we might well have reached a different decision. It is difficult to understand, for example, why Benner, a union official, and Jenson, a union steward, would not initially pursue relief through union procedures. An effort to communicate with the Company might have, at the very least, prevented the false statements concerning the dismissal of the Salt Lake drivers and the seven-day work week from being included in the release.

As stated earlier, however, we are constrained by the applicable standard of review from substituting our own judgment for that of the Board and are required to uphold the Board's findings if they are supported by substantial evidence on the record as a whole and if the Board has not acted arbitrarily or capriciously. Upon examination of the record in this case, we are unable to say that the Board's findings do not meet this standard.

Accordingly, the order of the Board will be enforced.