# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3099

_____

MikLin Enterprises, Inc., doing business as Jimmy John's

*Petitioner*

v.

National Labor Relations Board

*Respondent*

Industrial Workers of the World

*Intervenor*

_____

No. 14-3211

_____

National Labor Relations Board

*Petitioner*

v.

MikLin Enterprises, Inc., doing business as Jimmy John's

*Respondent*

Industrial Workers of the World

*Intervenor*

_____

National Labor Relations Board

_____

Submitted: June 11, 2015
Filed: March 25, 2016

_____

Before LOKEN, BYE, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

MikLin Enterprises, Inc., d/b/a/ Jimmy John's (MikLin), petitions for review of a National Labor Relations Board (Board) order holding MikLin engaged in unfair labor practices. The Board found MikLin violated sections 8(a)(1) and (3) of the National Labor Management Relations Act (Act),[1] by terminating or disciplining employees for engaging in protected concerted activity, and violated section 8(a)(1) by soliciting the removal of protected material from public places, removing union literature from an unrestricted employee bulletin board, and encouraging employees on Facebook to harass union supporters. The Board cross-appeals for enforcement of its order. We deny the petition for review and enforce the Board's order.

## I. Background

### A. Facts

MikLin owns and operates ten Jimmy John's franchises in Minneapolis and St. Louis Park, Minnesota. The Industrial Workers of the World (IWW) has been trying to organize employees at the ten stores since 2007. The unionization effort went

_____

[1]The Act is codified at 29 U.S.C. § 141 *et seq*. Sections 8(a) and (3) of the Act are codified at 29 U.S.C. §§ 158(a)(1) and (3).

public in September 2010. One of the issues highlighted in the organizing campaign was MikLin's lack of paid sick leave.

When hired, MikLin employees are given a copy of "Jimmy John's Rules for Employment." Rule 11 states: "Find your own replacement if you are not going to be at work. We do not allow people to simply call in sick! We require employees and mangers [sic] to find their own replacement! NO EXCEPTIONS!" On March 16, 2011, MikLin instituted a new attendance policy that established a disciplinary point system for missing work. Employees were still required to find their own replacements if they had to miss work.[2] The new policy provided:

> Absence due to sickness: With regard to absenteeism due to flu like symptoms, Team Members are **not allowed** to work unless and until those symptoms have subsided for 24 hours. Each day of sickness will count as a separate absence except that an absence of two or more consecutive days for the same illness will be counted as one "occurrence" when the Team Member supplies the Company with a medical certification that the Team Member has been seen by a doctor during the illness.

After the IWW lost a representation election in October 2010, it filed objections to the conduct of the election. The objections case was settled on January 11, 2011. The parties also settled an unfair labor practice case on January 11, 2011. After the settlement, a union supporter posted copies of the unfair labor practice

---

[2]Under the new policy, if an employee does not report to work but finds a replacement, no points are assessed. One point is assessed if an employee calls in at least one hour before their shift without finding a replacement; two points are assessed if an employee calls in less than an hour before the start of the shift; and three points are assessed for a no call/no show. Points are also assessed for tardiness. Points accumulate on a rolling 12-month basis. An employee receives a disciplinary coaching for 1 point, a recorded verbal warning after accumulating 2 points, a written warning for 3 points, and is terminated after accumulating 4 points.

charge and a "Frequently Asked Questions" (FAQ) flyer about the election and settlement on a bulletin board used freely by employees and others at one of MikLin's stores. MikLin had no policy limiting what employees could post on the board. The manager removed the postings each time they were posted.

In late January or early February 2011, employees David Boehnke, Brittany Koppy, Davis Ritsema, and Max Specktor placed posters featuring two identical, side-by-side photographs of a sandwich (Sandwich Posters) on community bulletin boards in the public area of several of MikLin's stores. Above the left sandwich was a label stating "Your Sandwich Made By A Healthy Jimmy John's Worker." Above the right sandwich was a label stating: "Your Sandwich Made By A Sick Jimmy John's Worker." Below the photographs, in larger white letters, the poster stated: "Can't Tell the Difference?" In smaller red letters, the poster stated: "That's Too Bad Because Jimmy John's Workers Don't Get Paid Sick Days. Shoot, We Can't Even Call In Sick." Below that, in even smaller white letters, the posters stated: "We Hope Your Immune System Is Ready Because You're About To Take the Sandwich Test . . ." Below that, in white letters approximately the same size as the labels at the top of the posters, the posters asked readers to "Help Jimmy John's Workers Win Sick Days. Support Us Online At www.jimmyjohnsworkers.org." Managers removed the posters.

On March 10, 2011, employees Ritsema, Specktor, Erick Forman, and Mike Wilklow met with Rob Mulligan, co-owner and vice president of MikLin, to discuss sick leave. They told Mulligan that MikLin employees were working while sick because they could not find replacements or afford to take time off without pay, and that having sick employees work jeopardized the Jimmy John's image and risked public safety. They presented Mulligan with a letter from IWW asking for paid sick leave. The letter informed Mulligan that if he did not meet with the employees again by March 20 to discuss changing MikLin's sick-leave policy, employees would post

the Sandwich Posters not just in stores but "in other place[s] where postings are common, citywide."

On March 10, the IWW issued a press release entitled, "Jimmy John's Workers Blow the Whistle on Unhealthy Working Conditions." The press release stated, "With Election Possibilities Ahead, Jimmy John's Union Returns With Action On Paid Sick Days" and attached a copy of the sandwich poster, a "10 Point Program for Justice at Jimmy John's," and the letter the employees had presented to Mulligan that same day. The first paragraph of the press release stated:

> Sick of working sick, today the Jimmy John's Workers Union blows the whistle on unhealthy working conditions and demands a change in sick leave policy. As flu season continues, the sandwich makers at this 10-store franchise are sick and tired of putting their health and the health of their customers at risk.

MikLin did not respond to the employees' March 10 letter. On March 20, employees Boehnke, Specktor, Wilklow, Collins, Eddins, and Koppy posted the Sandwich Posters in various public places within two blocks of each MikLin store. The posters were the same as those previously posted on in-store community bulletin boards, except these posters included Mulligan's phone number. That evening, Mulligan and others took down as many posters as they could find.

On March 22, MikLin fired Boehnke, Forman, Ritsema, Specktor, Wilklow, and Micha Buckley-Farlee for "being the leaders and developers" of the Sandwich Poster campaign, and issued final written warnings to Koppy, Isaiah Collins, and Sean Eddins for being "foot soldiers" in the campaign. The discharge notices for Ritsema and Buckley-Farlee also cited the March 10 press release as a reason for their discharge.

-5-

At least as early as October 17, 2010, a MikLin employee established a "Jimmy John's Anti Union" Facebook group, accessible to anyone with a Facebook account. Rob Mulligan, store managers, assistant managers, area managers, and other employees posted on the page, both during and after the organizing campaign. Many of the postings disparaged the organizing activities and the employees who supported the union, often using crude and profane language. Prior to the March 20, 2011, posting of the Sandwich Poster, Rob Mulligan posted a message on Facebook encouraging anyone who saw the Sandwich Posters around the Twin Cities to take them down. Sometime in March 2011, Rene Nichols, the Assistant Manager at the MikLin's store where Boehnke worked, posted Boehnke's personal cell phone number and suggested Facebook members text Boehnke to "let him know how they feel." Below that, she added, "Fuck You David. Forever."

## B. Procedural History

After the MikLin employees were discharged and disciplined, IWW filed three unfair labor practice charges. The Board's Acting General Counsel issued a consolidated complaint alleging MikLin committed unfair labor practices in violation of Sections 8(a)(1) and (3) of the Act. Following a two-day evidentiary hearing, the Administrative Law Judge (ALJ) issued a decision recommending that MikLin be found to have committed most, but not all, of the violations alleged in the consolidated complaint.

MikLin filed exceptions to the ALJ's decision. On August 21, 2014, the Board issued its Decision and Order affirming, as modified, the findings and recommended order of the ALJ. The Board found, by a 2–1 vote, that MikLin violated Sections 8(a)(3) and (1) of the Act by discharging and issuing written final warnings to employees because of their participation in the Sandwich Poster campaign, and violated Section 8(a)(1) by soliciting employees to remove the Sandwich Posters posted on non-MikLin property. The majority agreed with the ALJ that the posters

-6-

and the press release were sufficiently related to an ongoing labor dispute to be protected and that there was nothing in the posters or press release that was so disloyal, reckless, or maliciously untrue so as to cause the employees to lose the Act's protection.

The dissent strongly disagreed, finding the statement in the poster, "Shoot. We Can't Even Call In Sick" to be empirically false. The dissent concluded that, because the publishers of the posters knew the statement was false and published it anyway, the employees' distribution of the posters was maliciously motivated with the primary intent to injure MikLin's business reputation and income, rather than to redress the employees' sick leave grievance. The dissent found the employees had resorted to a means of protest so disloyal that their actions lost the Act's protection.

The Board unanimously agreed MikLin violated Section 8(a)(1) by removing union literature from otherwise unrestricted employee bulletin boards. The Board found certain of the statements soliciting and encouraging employees and managers on Facebook to contact a pro-union employee about his protected activities violated Section 8(a)(1).

MikLin filed a petition for review. The Board filed a cross-application for enforcement. The IWW intervened on behalf of the Board.

## II. Discussion

"[W]e afford great deference to the Board's affirmation of the ALJ's findings." NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 779 (8th Cir. 2013) (quotation omitted). "We will enforce the Board's order if it has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Id. at 779–80 (quotation omitted). "'Substantial evidence' is evidence that

'a reasonable mind might accept as adequate to support' a finding." NLRB v. Am. Firestop Sols., Inc., 673 F.3d 766, 768 (8th Cir. 2012) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)).

MikLin challenges four of the Board's findings: (1) that the conduct of the employees who participated in the Sandwich Poster campaign was protected under the Act; (2) that soliciting and encouraging employees to remove Sandwich Posters from property not belonging to MikLin violated the Act; (3) that the participation of MikLin supervisors and a co-owner in posting negative comments about an employee union supporter violated the Act; and (4) that removing union literature from an in-store bulletin board violated the Act.

## A. Discharge and Warning

Section 7 of the Act guarantees that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. "[I]t is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice." St. Luke's Episcopal-Presbyterian Hosps., Inc. v. NLRB, 268 F.3d 575, 579 (8th Cir. 2001) (quoting NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 398 (1983), abrogated on other grounds by Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 277–78 (1994)). Employees do not lose Section 7 protection simply by appealing to the public. Eastex, Inc. v. NLRB, 437 U.S. 556, 565 (1978).

Concerted activity may lose its protected status, however, if it is so detrimentally disloyal that it provides cause for an employer to discharge the employee. NLRB v. Local Union No. 1229, IBEW, 346 U.S. 464, 471–72 (1953).

Likewise, we have held that statements that are "materially false and misleading" are not protected by the Act.  St. Luke's, 268 F.3d at 581.  The Board has formulated its own two-part test to determine whether an employee's communication to a third party is deemed protected: (1) whether "the communication indicated it is related to an ongoing labor dispute," and (2) whether "the communication is not so disloyal, reckless or maliciously untrue as to lose the Act's protection."  Mountain Shadows Golf Resort, 330 N.L.R.B. 1238, 1240 (2000) (footnote omitted).

MikLin does not challenge the Board's finding that the poster and press release were made in the context of a labor dispute.  See 29 U.S.C. § 152(9) (defining "labor dispute" as "any controversy concerning terms, tenure or conditions of employment").  We agree substantial evidence supports this finding.  The poster informed the public that "Jimmy John's Workers Don't Get Paid Sick Days" and asked the public to contact MikLin's owner to "Help Jimmy John's Workers Win Sick Days."  The press release also referenced MikLin's sick-leave policy and the employees' "demand for paid sick days."

MikLin argues that the employees' speech lost its protection because the communications reached "a point where their methods of engaging in that activity [took] them outside the protection of the Act."  See St. Luke's, 268 F.3d at 581 (quoting NLRB v. Red Top, Inc., 455 F.2d 721, 726 (8th Cir. 1972)).  We have held that a statement crosses the line when it is made with "reckless disregard of its truth or falsity."  St. Luke's, 268 F.3d at 580 (quoting Montefiore Hosp. & Med. Ctr. v. NLRB, 621 F.2d 510, 517 (2d Cir. 1980)).  MikLin contends the employees involved in the campaign knew the statement in the poster, "Shoot, We Can't Even Call In Sick," was false and that Minnesota Health Department regulations prohibited employees from working with certain illnesses.  Thus, MikLin contends, the employees involved knew the overall message was materially false and misleading, rendering the poster an unprotected communication.

We begin our analysis with the recognition that "the task of maintaining the national labor policy has been delegated to the Board, not the courts," and that our review is "very narrow and limited." NLRB v. Honeywell, Inc., 722 F.2d 405, 407 (8th Cir. 1983); see also Local Union No. 1229, IBEW, 346 U.S. at 475 (recognizing the heavy responsibility that falls on the Board to find the facts and apply legal principles to those facts in a way consistent with the principles underlying the Act). The Board majority found that none of the statements in the posters or the press release were maliciously untrue—that is, "made with knowledge of their falsity or with reckless disregard for their truth or falsity." MikLin Enters., Inc., 361 N.L.R.B. No. 27, at *3 (2014) (quoting MasTec Advanced Technologies, 357 N.L.R.B. No. 17, at *5 (2011) ("Statements are maliciously untrue and unprotected, if they are made with knowledge of their falsity or with reckless disregard for their truth or falsity. The mere fact that statements are false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue.") (internal quotation marks and citations omitted)). The Board majority acknowledged that the statement, "[s]hoot, we can't even call in sick," may not have presented MikLin's entire sick leave policy, but found that it accurately characterized the practical impact of the policy: that employees were denied the ability to call in sick, either because they could not afford it or because they could not find a replacement. The Board majority found sufficient evidence in the record to support that impression, and accordingly found the communications were not made with knowledge of their falsity or with reckless disregard for the truth.[3]

_____

[3]MikLin argues the Board applied the wrong standard in finding the poster protected because it "does not reflect the law in the 8th Circuit." MikLin contends we have adopted a standard for truthfulness that is less rigid than "maliciously untrue." MikLin asserts the standard we apply is whether the communications are "materially false and misleading," citing St. Luke's, 268 F.3d at 580–81. Even if we assume for purposes of analyzing Miklin's argument that our standard is less demanding than that applied by the Board, we nonetheless conclude the poster is protected speech because it can be reasonably interpreted in a way that is not materially false. "Where, as here, the evidence supports two reasonable inferences,

We conclude there was substantial evidence in the record to support the Board majority's finding. First, Rule 11 of MikLin's "Rules for Employment" states "Find your own replacement if you are not going to be at work. We do not allow people to simply call in sick! We require employees and mangers [sic] to find their own replacement! NO EXCEPTIONS!" Although MikLin implemented a new attendance policy four days prior to the posters being posted, the new policy also includes at least a disciplinary coaching for an employee who calls in sick without a replacement. In addition, employees testified without contradiction about being directed to work while sick if they could not find coverage or face discipline, as well as actually working while sick and observing other employees work while sick. The employees who responded to an IWW survey about sick leave reported working nearly eighty percent of the time that they were sick because they could not find coverage, could not afford to lose a day's pay, or both.

Finally, the poster clearly states that its purpose is to obtain paid sick leave. We think this puts the statement, "Shoot, we can't even call in sick," in context. Exaggerated rhetoric is common in labor disputes and protected under the Act. See Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin, 418 U.S. 264, 286 (1974); see also Local No. 1229, IBEW, 346 U.S. 464, 476–77 (1953) (criticizing the failure of the employees to disclose the ongoing labor dispute behind the handbills and recognizing that disclosure of the employees' motive "might have lost more public support for the employees than it would have gained"); Sierra Pub. Co. v. NLRB, 889 F.2d 210, 217 (9th Cir. 1989) ("[T]hird parties who receive appeals for support in a labor dispute will filter the information critically so long as they are aware it is generated out of that context."). Constrained as we are "by the applicable standard of review from substituting our own judgment for that of the Board," NLRB

---

we may not preempt the Board's choice between two fairly conflicting views of that evidence." JCR Hotel, Inc. v. NLRB, 342 F.3d 837, 842 (8th Cir. 2003) (internal quotation omitted).

v. Greyhound Lines, Inc., 660 F.2d 354, 358 (8th Cir. 1981), we conclude the Board reasonably found that the statement, "Shoot, we can't even call in sick," was not "made with either actual knowledge of [its] falsehood or with reckless disregard for [its] veracity." RELCO Locomotives, 734 F.3d at 791.

In the alternative, MikLin asserts the method the employees used crossed the line into unprotected disloyalty and public disparagement of its product. MikLin argues the campaign was maliciously motivated by an intent to injure MikLin's business reputation and income, rather than to enlist the support of the public for IWW's demand for paid sick leave. MikLin claims the statement, "We hope your immune system is ready because you're about to take the sandwich test," only can be read to mean that consumers are at risk by eating its sandwiches, greatly exaggerating the potential public health problem. Finally, MikLin urges us to conclude that the fact the posters do not distinguish Jimmy John's, the franchiser, from MikLin, a franchisee, further supports the conclusion that the employees were maliciously motived.

The Board majority held the statements were not so disloyal or recklessly disparaging as to lose protection under the Act. Whether we "might have made different findings upon an independent consideration of the same evidence," we recognize "[i]t is not the function of this Court to try the case de novo or to substitute its own appraisal of the evidence for that of the Board." Greyhound Lines, Inc., 660 F.2d at 356 (quoting NLRB v. Brown & Root, Inc., 311 F.2d. 447, 451 (8th Cir. 1963)). "It is widely recognized that not all employee activity that prejudices the employer, and which could thus be characterized as disloyal, is denied protection under the Act." Five Star Transp., Inc. v. NLRB, 522 F.3d 46, 53 (1st Cir. 2008). Concerted employee activity loses protection when it reaches "a point where their methods of engaging in that activity [took] them outside the protection of the Act." See St. Luke's, 268 F.3d at 581 (quoting NLRB v. Red Top, Inc. 455 F.2d 721, 726 (8th Cir. 1972)); see also NLRB v. Wash. Aluminum Co., 370 U.S. 9, 17 (1962)

-12-

(interpreting the denial of Section 7 protection to employees in <u>Local No. 1229, IBEW</u> to be based on "a disloyalty to the workers' employer which this Court deemed unnecessary to carry on the workers' legitimate concerted activities").

We cannot say the Board majority erred in finding that the statements fell short of unprotected disloyalty and disparagement. The Sandwich Poster campaign was directly tied to the dispute over sick leave and solicited public support for the employees' campaign. There was substantial evidence in the record tying the effort to obtain paid sick leave with the effect that the lack of paid sick leave could have on MikLin's product. For example, there was uncontroverted testimony that MikLin employees worked while sick. The posters and the press release also did not use language intended to degrade or humiliate. <u>Cf.</u> <u>NMC Finishing v. NLRB</u>, 101 F.3d 528, 531 (8th Cir. 1996) (acknowledging that obscenity, "especially obscenity designed to 'degrade and humiliate'" may not be protected under the Act). The posters identified MikLin and were all posted within a two-block radius of MikLin stores.[4]

Finally, MikLin sandwiches were in fact cited on two separate occasions as the source of a public norovirus outbreak. The Board dissent asserts the posters "greatly exaggerated the potential public health problem" and conveyed the message that "customers are getting sick and will continue to get sick." We acknowledge that is one way the poster could be viewed. We think it just as likely the poster would be

---

[4]We find unpersuasive MikLin's suggestion that the poster and press release lost protection by including the name of franchiser Jimmy John's. The posters targeted MikLin by asking the public to contact Rob Mulligan, the co-owner of MikLin, and were posted near MikLin stores. The press release likewise identified the Mulligans and their "10-store franchise." Furthermore, MikLin does business as Jimmy John's, and is known to the public by that name, MikLin follows Jimmy John's suggested sick-leave policy in Rule for Employment 11, and the notices of termination issued to the employees when they were fired were on Jimmy John's forms.

viewed in the manner the Board majority found: that the posters only "suggest the realistic potential for illness resulting from the handling of food by workers who come to work while sick." See MikLin Enters., Inc., 361 N.L.R.B. No. 27, at *8. "We may not displace the Board's choice between two fairly conflicting views, even if we would justifiably have made a different choice had the matter been before us de novo." See Midwest Precision Heating & Cooling, Inc., 408 F.3d at 458 (quotation and alteration omitted). Accordingly, we defer to the Board majority's finding that the Sandwich Poster campaign communications were not so disloyal as to lose protection under the Act.

## B. Interference with Exercise of Rights

As a general rule, an employer violates Section 8(a)(1) of the Act by engaging in conduct that "reasonably tends to interfere with the employees' exercise of their Section 7 rights." Mississippi Transp., Inc. v. NLRB, 33 F.3d 972, 977–78 (8th Cir. 1994) (internal quotation and alteration omitted). In this case, the Board majority ruled MikLin violated the Act when one of the co-owners solicited employees to remove the publicly-posted Sandwich Posters.[5] The Board unanimously agreed that MikLin violated the Act when its supervisory employees harassed and solicited others to harass union supporters by means of Facebook postings and managers removed union literature from workplace bulletin boards.

### i. Mulligan's Facebook Postings

MikLin concedes co-owner Robert Mulligan's March 20, 2011, posting on the "Jimmy John's Anti-Union" Facebook page encouraged and solicited employees to take down the Sandwich Posters. MikLin asserts this did not violate the Act because

---

[5]The dissent did not believe MikLin's encouragement of employees to remove the Sandwich Posters from public places violated the Act.

these comments were an expression of opinion protected by Section 8(c) of the Act[6] and contained no threat of reprisal or force or promise of benefit.[7] Specifically, Mulligan's posting read:

> So I just got a text from our pal David Boehnke, he and the IWW are threatening to put up thousands of posters that threaten our business and your jobs. They plan on doing this if we don't meet with them which we will not do. I encourage anyone to take donw [sic] any posters that they may see around the twin cities. These posters are defamatory.

"It is well established that employers have a free speech right to communicate their views on unionization to employees and that this right cannot be infringed by a union or the Board." NLRB v. Intertherm, Inc., 596 F.2d 267, 277 (8th Cir. 1979) (citing NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1979)). But an employer who goes beyond expressing opposition to a union to predicting the negative effects unionization may have on its business, employees, and their incomes or work opportunities risks violating the Act. Id. In determining whether an employer's challenged statement is protected under Section 8(c), "we look to the context of its particular labor relations setting and balance the employer's right of expression against the equal right of employees to associate freely with a collective bargaining

---

[6]Section 8(c) provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C.A. § 158(c).

[7]MikLin also claims that, because the posters were not protected speech, encouraging others to tear them down was not unlawful. Because we find the posters were protected speech, we disagree.

-15-

setting." Id. This balancing takes into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of [their] relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." Id. (quoting Gissel Packing Co., 395 U.S. at 617).

The Board long has held that a high-level supervisor's conduct in directing others to remove protected signs interferes with employees' exercise of Section 7 rights. See Williamson Piggly Wiggly, Inc., 280 N.L.R.B. 1160, 1163 (1986), enforced, 827 F.2d 1098 (6th Cir. 1987) (store manager's conduct in driving employee through town to tear down protected union campaign signs from public places found to violate Act); Muncy Corp., 211 N.L.R.B. 263, 272 (1974), enforced, 519 F.2d 169 (6th Cir. 1975) (owner's conduct in tearing down protected union picket signs from utility poles found to be an unfair labor practice). Here, the Board majority concluded that the Sandwich Poster was a protected communication to the public and accordingly found that Mulligan's Facebook message violated Section 8(a)(1) because encouraging employees to take down the posters could be expected to chill employees' exercise of their Section 7 rights.

MikLin argues that Mulligan's posting was an expression of opinion protected by Section 8(c) because it contained "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Mulligan's posting was on a Facebook page that was open to the public, including other MikLin rank and file employees. Mulligan's encouragement to employees to take down the posters was not an expression of a "view[], argument, or opinion." See RELCO Locomotives, 734 F.3d at 781. The statement that the posters "threaten our business and your jobs" easily could be viewed as a threat of reprisal if employees did not take down the posters. We cannot say that the Board erred in finding that such a posting by a MikLin co-owner reasonably interfered with employees' exercise of their Section 7 rights.

-16-

## ii. Facebook Postings by Supervisors

MikLin claims postings by supervisors and assistant managers on the anti-union Facebook page did not violate the Act because there was no evidence linking the postings to any particular protected activity of Boehnke. In addition, MikLin contends the comments did not violate the Act because there was no pending election at the time the comments were posted and some of the comments were posted after Boehnke was fired. MikLin further insists the comments were not unlawful because they were not sufficiently scathing and they were not made in person, in front of other employees. MikLin characterizes the statements as simply a reflection of the supervisors' personal dislike for Boehnke and as unconnected to his union activity.

Rene Nichols, the Assistant Manager at a store where Boehnke worked, posted Boehnke's personal cell phone number and encouraged other employees to text him and tell him what they thought, followed by the comment, "Fuck you David! Forever." A former employee posted an altered picture of Boehnke wearing union apparel and a ball cap labeled "Shithead" with feces on the bill.[8] Supervisors Eddie Guerrero and Melissa Erickson encouraged employees to re-post the picture of Boehnke "everywhere."

"It is well settled that the Act countenances a significant degree of vituperative speech in the heat of labor relations." Trailmobile Trailer, LLC, 343 N.L.R.B. 95, 95 (2004). "Words of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1)." Sears, Roebuck & Co., 305 N.L.R.B. 193, 193 (1991). Whether a violation occurs depends on the context of the statements. See id.

---

[8]The former employee, Ben McCarthy, had been fired several months earlier for actually putting feces in Boehnke's coat pocket.

The Board has found that an employer violates Section 8(a)(1) by "denouncing and humiliating [a union supporter] in the presence of another employee" or by "harassing him and threatening his physical safety . . . because of his support for the Union." Dayton Hudson Corp., 316 N.L.R.B. 477, 483 (1995). Likewise, an employer's "disparaging characterization" of union supporters has been found unlawful when it "has the coercive effect of holding employees' protected concerted activities up to ridicule and frustrating such activities." Rankin & Rankin, Inc., 330 N.L.R.B. 1026, 1037 (2000). The Board has so ruled because such conduct may "make the employees believe that their . . . loyalty to the Union [is] not worth the effort in the face of such degradation," thus having "the tendency of discouraging [them] from engaging in activities protected by Section 7 of the Act." Domsey Trading Co., 310 N.L.R.B. 777, 793 (1993), enforced, 16 F.3d 517 (2d Cir. 1994). We likewise have concluded that directing offensive words specifically to a singled-out employee is unprotected conduct because an objective, reasonable employee would tend to feel coerced, intimidated and harassed. See NMC Finishing v. NLRB, 101 F.3d 528, 532 (8th Cir. 1996) (finding such conduct unprotected in context of striking employees' derision of non-striking employee); see also NLRB v. Trumbull Asphalt Co. of Del., 327 F.2d 841, 844–45 (8th Cir. 1964). Furthermore, "[t]here is much authority for the proposition that a supervisor commits an unfair labor practice by ratifying the illicit threats of another." Intertherm, Inc., 596 F.2d at 272.

Substantial evidence supports the Board's finding that the postings were sufficiently linked to Boehnke's protected activity. It was well known that Boehnke was an IWW supporter. Nichols solicited the group to contact Boehnke and "tell him how they feel" shortly after Mulligan notified the Facebook group about the text message he had received from Boehnke regarding the Sandwich Poster campaign. The doctored photograph depicted Boehnke wearing a union button and contained the IWW's logo of three cats wearing aprons. Finally, all the posts were made on the "Jimmy John's Anti Union" Facebook page and there were many other negative

comments about the unionization effort, union supporters, and the Sandwich Poster campaign noted on the Facebook page. Other MikLin employees who witnessed management's reaction to Boehnke's protected activity could reasonably fear similar treatment for engaging in such activity and would be discouraged from exercising their Section 7 rights. We find unpersuasive Miklin's argument that the supervisors' comments did not violate the Act because there was no election pending. The Act protects the exercise of Section 7 rights from interference in a broad range of contexts, including this one, and not just during representation campaigns. See, e.g., NLRB v. Washington Aluminum Co., 370 U.S. 9, 14–15 (unrepresented employees have Section 7 rights).

### iii. Removal of In-Store Posters

After the January 11, 2011, settlement, a MikLin employee posted copies of the settled unfair-labor-practice charge and an FAQ flyer on an in-store community bulletin board in one of MikLin's stores. MikLin asserts it was not a violation of the Act for a manager to take down the postings because the statements in the FAQ were materially false statements that were intended to undermine the authority of management. While conceding there was no evidence that the flyer disrupted workplace discipline or productivity, MikLin nonetheless contends it had the right to remove the postings because there was a potential for negative consequences. The Board found this activity to be a violation of Section 8(a)(1) of the Act.

An employer has the right to prohibit union literature upon a showing that the ban is necessary to maintain plant discipline or productivity. Am. Cast Iron Pipe Co. v. NLRB, 600 F.2d 132, 135–36 (8th Cir. 1979) (citing Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n.10 (1945)). While an employer does not have to give unions or employees special access to bulletin boards, once an employer permits employees to use a bulletin board, it is a violation of Section 8(a)(1) of the Act to selectively prohibit union postings. Id. "The critical question is whether the

employer is discriminating against union messages, or if it has a neutral policy of permitting only certain kinds of postings." HealthBridge Mgmt., LLC v. NLRB, 798 F.3d 1059, 1073 (D.C. Cir. 2015) (quoting Loparex LLC v. NLRB, 591 F.3d 540, 545 (7th Cir. 2009)).

The record shows that MikLin had no policy as to what could be posted on the in-store bulletin boards, and management approval was not required. In practice, employees posted a variety of material on the boards, including union campaign literature as well as non-union related activity such as notices about parties or concerts. Under these circumstances, we agree with the Board that MikLin's selective removal of the flyer and the charge was an unfair labor practice.

## III. Conclusion

We conclude the Board's decisions were supported by substantial evidence. We therefore grant the Board's application for enforcement and deny MikLin's petition for review.

LOKEN, Circuit Judge, dissenting in part.

I respectfully dissent from Parts II.A and II.B.i of the court's opinion. I agree with the dissenting Board member that MikLin did not violate the National Labor Relations Act ("the Act") by removing "contaminated-sandwich" posters publicly displayed near its stores and by discharging employees responsible for this damaging disparagement because they "clearly resorted to a means of protest so disloyal as to lose the Act's protection." MikLin Enters., Inc., 361 N.L.R.B. No. 27, at *12 (2014) (Johnson, M., dissenting in part).

**A.** The Board held that MikLin violated Sections 8(a)(1) and (3) of the Act when it discharged six employees "for their participation in the [contaminated-

sandwich] poster campaign." Id. at *2. The Board ordered the employees reinstated with back pay. Section 10(c) provides that the Board may not require reinstatement or order back pay for an employee who has been discharged "for cause." 29 U.S.C. § 160(c). Section § 10(c) "cannot mean that an employer is at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects." NLRB v. Wash. Aluminum Co., 370 U.S. 9, 17 (1962). Thus, the critical issue is whether publishing the contaminated-sandwich posters near MikLin's "Jimmy John's" sandwich shops was concerted activity protected by § 7. This issue turns on proper interpretation of the Supreme Court's controlling decision in NLRB v. Local Union No. 1229, IBEW, 346 U.S. 464, 472 (1953) (Jefferson Standard).

In Jefferson Standard, the Court considered whether a radio station violated § 8(a)(1) when it fired technician employees because -

> at a critical time in the initiation of the company's television service, they sponsored or distributed 5,000 handbills making a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income.

346 U.S. at 471. The Board held that the employer had "cause" to discharge within the meaning of § 10(c), finding that the employees "deliberately undertook to alienate their employer's customers by impugning the technical quality of his product." Id. The Supreme Court upheld this decision. "There is no more elemental cause for discharge of an employee than disloyalty to his employer," the Court explained. Id. at 472. Absent a labor controversy, the technicians' conduct "unquestionably would have provided adequate cause for their disciplinary discharge within the meaning of § 10(c)." Id. at 476. The "coexistence of a labor dispute" afforded them no defense:

> Even if the attack were to be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned in § 7, the means used by the technicians in conducting the

-21-

attack have deprived the attackers of the protection of that section, when read in the light and context of the purpose of the Act.  Id. at 476-78.

Here, distributing the contaminated-sandwich posters was part of a labor controversy, namely, the employees' concerted activity to unionize and to obtain better working conditions, including sick pay.  The Board majority recognized that, under Jefferson Standard, the employee communications could nonetheless be "so disloyal" as to be unprotected.   But, noting that "Board law has developed considerably in its approach to the question of employee disloyalty," 361 N.L.R.B. No. 27, at *5 n.18, the Board applied a restrictive standard that effectively gutted the Supreme Court's governing disloyalty principle:

> To lose the Act's protection as an act of disloyalty, an employee's public criticism of an employer must evidence a malicious motive.  (Id. at *4, quotation omitted.)
>
> Even communications that raise highly sensitive issues such as public safety have been found protected where they are sufficiently linked to a legitimate labor dispute and are not maliciously motivated to harm the employer.  (Id. at *4-5.)
>
> Here, where . . . the posters' message was closely tied to the employees' interest in obtaining sick days, the labor dispute is made clear in the posters, and the posters were not shown to be maliciously untrue, the posters are protected.  (Id. at *5 n.18.)

In a significantly different labor law context, the Board has long held that a defamatory false statement made during a labor dispute does not lose § 7 protection unless made with "actual malice."  See Jolliff v. NLRB, 513 F.3d 600, 610 (6th Cir. 2008).   In this defamation context, the Board defines malice "as a shorthand expression of the 'knowledge of falsity or reckless disregard of the truth' standard," not "malice in the common-law sense -- as 'hatred, personal spite, ill will, *or desire*

*to injure.*'" Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 281 (1974) (emphasis added). By adopting this narrow definition of malice as an element of the Jefferson Standard inquiry, the Board effectively removed from the inquiry the central § 10(c) issue as defined by the Supreme Court -- disloyalty.

In Jefferson Standard, the Court explained that the disparaging statements lost the Act's protection due to "the means used by the technicians." 346 U.S. at 477-78. The Court described the disloyal statements as "a sharp, public, disparaging attack . . . reasonably calculated to harm the company's reputation and reduce its income," and as a deliberate effort to alienate their employer's customers by impugning the technical quality of its product. Id. at 471. The Court never mentioned malice, a term that has different meanings in different legal contexts. But its characterization of the employees' intent was an obvious reference to malice in the common law sense, which includes desire to injure.

Our prior cases confirm that an employee's disloyal statements can lose § 7 protection without a showing of actual malice as the Board has defined it. In NLRB v. Red Top, Inc., we held that a threat by employees to divulge damaging information was unprotected because it was "an act of disloyalty to the employer's business interests." 455 F.2d 721, 727 (8th Cir. 1972). And in St. Luke's Episcopal-Presbyterian Hospitals, Inc. v. NLRB, we expressly rejected the contention that public disparagement of an employer "was protected activity unless maliciously false." 268 F.3d 575, 579 (8th Cir. 2001). In St. Luke's, a hospital discharged a nurse who went on local television and accused her employer of "jeopardizing the health of mothers and babies" by altering shift assignments and responsibilities. Id. at 577. We explained that cases interpreting Jefferson Standard "establish that an employee exceeds the boundaries of protected activity when she falsely and publicly disparages her employer or its products and services." Id. at 580. In reversing the Board, we concluded that the nurse was not wrongfully discharged "because her false and

-23-

disparaging public statement alienated her from her most important coworkers and made her continued employment untenable." Id. at 582.

By requiring proof that disloyal conduct be the product of a malicious motive, as narrowly defined, the Board fundamentally misinterpreted both Jefferson Standard and our decisions construing and applying Jefferson Standard. This is an issue of law we review *de novo*. See NLRB v. U.S. Postal Serv., 660 F.3d 65, 68 (1st Cir. 2011); N.Y. N.Y., LLC v. NLRB, 313 F.3d 585, 590 (D.C. Cir. 2002); accord Owen v. Bristol Care, Inc., 702 F.3d 1050, 1054 (8th Cir. 2013). I would deny enforcement for this reason alone.

**B.** Turning to the merits of this case, I acknowledge that applying Jefferson Standard's disloyalty principle is often difficult. Section 7 protects efforts by employees and unions to seek public support for their concerted activities, and public complaints about working conditions frequently implicate sensitive issues such as product and workplace safety. See Misericordia Hosp. Med. Ctr. v. NLRB, 623 F.2d 808, 814 (2d Cir. 1980) (public criticisms "were a necessary" and "a responsible attempt to remedy" a grievance). The Supreme Court in Jefferson Standard recognized that its decision would apply only to egregious acts of employee disloyalty; it noted the Board's judgment that the employee tactics at issue "were hardly less 'indefensible' than acts of physical sabotage." 346 U.S. at 477. Recognizing the disloyalty principle is limited to extreme cases, I have no difficulty concluding that MikLin had good cause to fire the six employees.

After losing a union-representation election, pro-union employees delivered an ultimatum to MikLin -- provide paid sick leave or we will launch a publicity campaign claiming MikLin is serving its customers contaminated sandwiches. When management balked, the employees acted, launching "a sharp, public, disparaging attack upon the quality of the company's product." Jefferson Standard, 346 U.S. at 471. First, they hung posters in MikLin stores displaying a sandwich "made by a sick

-24-

Jimmy John's worker."  The poster asked whether the viewer could tell whether the sandwich was contaminated and warned: "we hope your immune system is ready because you're about to take the sandwich test."  Next, the employees issued a press release to over one hundred media outlets around the country titled "Jimmy John's Workers Blow the Whistle on Unhealthy Working Conditions."  The opening paragraph declared, "As flu season continues, the sandwich makers at this 10-store franchise are sick and tired of putting their health and the health of their customers at risk."  An attachment accused MikLin of "put[ting] . . . customers at risk in the name of pinching pennies."  When MikLin did not accede to the demand that it meet with a union committee and negotiate the sick pay issue, the employees posted hundreds of the contaminated-sandwich posters within two blocks of MikLin's Minneapolis sandwich shops.  This version asked people to call Robert Mulligan, MikLin's owner, "to let him know you want healthy workers making your sandwich."

The employees structured this attack to have the maximum adverse effect on MikLin's reputation and income.  They chose March as a "good time" to launch the attack "because it was flu season."  They issued a *national* press release, even though their dispute was with a *local* Jimmy John's franchisee.  Instead of naming MikLin in the posters, they named Jimmy John's, embroiling the entire enterprise in their local dispute, including the many Jimmy John's shops in the Twin Cities not owned by MikLin.  This was not publicity "narrowly tailored to effectuate the [employees' concerted] aims."  Five Star Transp., Inc. v. NLRB, 522 F.3d 46, 54 (1st Cir. 2008).  Rather, the employees selected and disseminated a message that would "hit the employer where it would hurt, by interfering with its business relations with its customers."  Red Top, 455 F.2d at 727.  And the fear-mongering attack worked as designed.  Robert Mulligan testified that he was "bombarded by" calls and text messages from customers who "were scared to eat at Jimmy John's."

Employee allegations that a food industry employer is selling contaminated products are likely to have a devastating impact.  As the D.C. Circuit explained:

-25-

[W]hen a union claims that a food product produced by a struck company is actually tainted it can be thought to be using the strike equivalent of a nuclear bomb; the unpleasant effects will long survive the battle. The company's ability to sell the product, even if the strike is subsequently settled, could well be destroyed. If a customer becomes apprehensive to bite into Diamond's walnuts because of a concern at finding an impurity (even part of a worm), it is unlikely that a strike settlement will eliminate that visceral fear.

Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259, 1267 (D.C. Cir. 1997) (en banc) (citation omitted), cert. denied, 523 U.S. 1020 (1998). Here, the employees' posters graphically told customers (i) that MikLin's sandwich makers were working when they are sick ("Shoot, we can't even call in sick"), and (ii) that sandwiches made when they are sick will be contaminated ("we hope your immune system is ready"). Thus, from the array of possible tactics, the employees selected a tactic sure "to harm [MikLin's] reputation and reduce its income." Jefferson Standard, 346 U.S. at 471. The Act does not protect such calculated, devastating attacks upon an employer's reputation and products. See Endicott Interconnect Techs., Inc. v. NLRB, 453 F.3d 532, 537 (D.C. Cir. 2006); accord Coca Cola Bottling Works, Inc., 186 N.L.R.B. 1050, 1054 (1970) (finding employee "Health Warning" leaflet unprotected because "the main thrust of the leaflet was to create fear in the public's mind that drinking Coca Cola would be harmful to the health of the purchaser because of the presence of foreign objects such as roaches and mice in the bottle").[9]

Significantly, the employees' scare message was deliberately false. They knew MikLin required its employees to call in sick if they had experienced flu-like symptoms in the last 24 hours, as Minnesota Department of Health regulations

---

[9]The Board did not cite Diamond Walnut Growers or St. Luke's, the most relevant circuit court authorities. It dismissed Coca Cola as Board precedent that "has been implicitly overruled." MikLin, 361 N.L.R.B. No. 27, at *5 n.18.

required. The record is full of examples of MikLin providing time off to sick employees. In addition, the posters grossly exaggerated the danger of eating a MikLin sandwich. Over the employer's ten-year history, when its ten stores served eight million sandwiches, the Department of Health investigated just *two* reports of gastrointestinal illness among MikLin's employees or customers, in January 2006 and January 2007. As the ALJ noted: "Given [MikLin's] record over a 10-year period one could regard the risk of becoming ill by eating at one of [its] shops to be infinitesimal." MikLin, 361 N.L.R.B. No. 27, at *23. The employees' decision to portray an infinitesimal risk as a clear and present threat to customers was recklessly misleading, suggesting a predominant intent to harm MikLin in the wake of their unsuccessful union election, not an appeal for public support. See St. Luke's, 268 F.3d at 580-81.

Moreover, the dramatic poster allegations of food contamination were not necessary to aid the employees' labor dispute. As the ALJ noted, "there has been no direct correlation established between these incidents and the absence of sick leave." MikLin, 361 N.L.R.B. No. 27, at *23. Rather, the employees punished MikLin by urging customers not to buy its sandwiches out of an unwarranted fear of becoming ill. See Montefiore Hosp. & Med. Ctr. v. NLRB, 621 F.2d 510, 517 (2d Cir. 1980).

The employees' misleading contaminated-sandwich allegations were both devastating to MikLin's business and unnecessary to advance their concerted activity. This is precisely the type of "detrimental disloyalty" that falls outside the protection of § 7. As Board Member Johnson stated, "Any employee who is willing to make up allegations out of whole cloth against his or her employer is obviously far more disloyal, in any meaningful sense of that word, then one who acts upon a reasonable but mistaken belief." 361 N.L.R.B. No. 27, at *12 (Johnson, M., dissenting in part). Because the publicity campaign was unprotected activity, MikLin did not violate the Act by discharging employees responsible for the disloyal public campaign, and by urging employees on an employee-created Anti-Union Facebook page to remove the

-27-

disparaging posters from public property near where they worked. <u>See</u> <u>Jefferson Standard</u>, 346 U.S. at 478; <u>Endicott</u>, 453 F.3d at 538.

For these reasons, I respectfully dissent from Parts II.A and II.B.i of the court's opinion. I join Parts II.B.ii and II.B.iii for the reasons stated.

————————————————