# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3169
No. 00-3410

_____

St. Luke's Episcopal-Presbyterian    *
Hospitals, Inc.,    *
   *
     Petitioner - Cross-Respondent,    *    Petitions for Review or Enforcement
   *    of an Order of the National
     v.    *    Labor Relations Board.
   *
National Labor Relations Board,    *
   *
     Respondent - Cross-Petitioner.    *

_____

Submitted:  April 10, 2001

Filed:  October 10, 2001

_____

Before LOKEN, Circuit Judge, BOGUE,[*] District Judge, and GOLDBERG,[**] Judge
of the United States Court of International Trade.

_____

LOKEN, Circuit Judge.

     In 1991, Carol Hollowood became a registered nurse first assistant ("RNFA")
in the labor and delivery department of St. Luke's Episcopal-Presbyterian Hospital

_____

     [*]The HONORABLE ANDREW W. BOGUE, United States District Judge for
the District of South Dakota, sitting by designation.

     [**]The HONORABLE RICHARD W. GOLDBERG,  sitting by designation.

in Chesterfield, Missouri. On June 1, 1998, Hollowood appeared on a local television news broadcast and accused St. Luke's of "jeopardizing the health of mothers and babies" by altering the shift assignments and responsibilities of the labor and delivery RNFAs. Hollowood was discharged four days later. The Textile Processors, Service Trades, Health Care, Professional and Technical Employees Union (the "Union") filed an unfair labor practice charge on her behalf. After a hearing, the National Labor Relations Board ruled that St. Luke's violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), by terminating Hollowood on account of protected concerted activity. St. Luke's petitions for review of the Board order, and the Board cross-petitions for enforcement. We grant the petition for review and deny enforcement.

The primary duties of a labor and delivery RNFA are to assist surgeons in Cesarean-sections, tubal ligations, and hysterectomies performed in St. Luke's obstetrical operating rooms. In August 1997, St. Luke's advised the eight labor and delivery RNFAs that the hospital would alter their work assignments from two twenty-four-hour shifts to four twelve-hour shifts each week, increase their non-surgical patient care duties, and replace three RNFAs with lesser-trained operating room staff. The RNFAs opposed these changes. All but one declined to stay in the labor and delivery department working twelve-hour shifts, instead accepting St. Luke's offer of twenty-four-hour RNFA positions in other surgery departments. Hollowood objected because twenty-four-hour shifts gave her more time to work at a second job and because she did not want to take on more non-surgical patient duties. However, she agreed to continue working twenty-four-hour shifts in the labor and delivery department during a transition period, where she helped train new nurses for the open RNFA positions.

In the ensuing months, the labor and delivery RNFAs complained to physicians and hospital administrators that patient care would be compromised by these changes. In addition, Hollowood and Mike O'Neil, an operating room RNFA, used this dispute

to renew their efforts to organize St. Luke's nurses on behalf of the Union. By March 1998, O'Neil, Hollowood, and a "core group of coworkers" were openly campaigning to organize St. Luke's nurses. Hollowood testified that she persuaded forty-two nurses to sign petitions to be represented by the Union. St. Luke's concedes it was aware of Hollowood's participation in these organizing activities.

On June 1, O'Neil, Hollowood, and a contract physician in the labor and delivery department arranged to be interviewed by a reporter for a local TV station. Part of the interview appeared on that evening's news, with Hollowood's remarks playing a lead role:

> ANCHOR: Our top story at ten, some doctors and nurses at St. Luke's Hospital are angry about changes they say threaten the health of expectant mothers in the delivery room.
>
> ANCHOR 2: The changes affect the medical teams that perform C-sections at St. Luke's. . . .
>
> REPORTER: Well Rick and Karen there are eight specially trained nurses that assist staff obstetricians with C-sections at St. Luke's. They each have anywhere between 15 to 23 years of seniority with the hospital and a whole lot of experience. Until recently, the nurses worked on a system of 24 hour shifts they say was essential to the care of mothers ready to deliver. Well, now the RNs accuse the hospital of cutting their shift in order to replace them with less qualified employees.
>
> Registered nurse first assistant Carol Hollowood says when a patient comes into the delivery room at St. Luke's, she's treated like a member of the family. But Hollowood accuses the powers that be of jeopardizing the health of mothers and babies by offering her and her counterparts short shifts and more responsibilities.
>
> CAROL HOLLOWOOD R.N.: Initially two years ago we had three people on a 24 hour shift, because, as we said before, Dr. Gearhart said,

that labor and delivery you have emergencies that can happen not one at a time but possibly two at a time where we needed a crew of people that were qualified to assume the responsibility of these emergencies for mother and baby. And then two years ago, they reduced to two and didn't allow us to do two sections at one time or two cases at one time in labor and delivery. And now what they're trying to do is have one person cover what three people did two years ago.

REPORTER: Hollowood opted to transfer to another section of the hospital. She's certain that her replacement won't have her qualifications.

Following Hollowood's statement, the contract physician complained that nurses were being replaced by "patient care technicians." O'Neil then stated that nurses would use collective bargaining "to refocus the issues back on the patient and fight for their rights for adequate staffing."

At the Board hearing, hospital administrators testified that, in the three days following June 1, they received strong negative reactions to Hollowood's public statement from many St. Luke's physicians and nurses. On June 2, Dr. George Tucker, the hospital's president, received a hand-written note from Dr. Ron Leidenfrost, the chief cardiovascular surgeon, stating that if the two disloyal nurses were still employed at the hospital, "please keep them out of my work areas -- they are poison to this organization." Dr. David Krajcovic, Chief of Surgery, complained to Tucker personally and then wrote on June 4: "I do not care to have [Hollowood] work in my room during OR procedures." Dr. Carlton Pearse, an OBGYN surgeon responsible for training RNFAs, wrote on June 4: "Since Carol's public statements, the staff on the L&D floors have indicated that they do not wish to work with her and feel she will be constantly watching them to see if they do anything wrong and then run and tell the media. . . . I will not work with her or have her deal with my patients." Gail Wagner, Vice President of Patient Services, testified that physicians and staff were very upset that Hollowood had publicly said "they weren't competent and that

-4-

things were unsafe for the patients, which was not the case." Patricia Geldbach, Director of Surgical Services, testified that Hollowood's remarks were "the talk of the operating room" the day after the news broadcast. Dr. Druck, President of St. Luke's medical staff, an elected position, told Geldbach "that 90 percent of the physicians in the doctor's lounge were very angry [and] were very concerned about what this was going to do to the hospital." Janette Gunn, Patient Care Manager for the labor and delivery department, testified she had never seen an adverse staff reaction so widespread and extreme. Consistent with her testimony at the hearing, labor and delivery RNFA Susan Browning wrote St. Luke's on June 5, explaining that Hollowood's accusations were false and concluding:

> Hollowood has been undermining the RNFA program for six months. She has made derogatory comments about me and administration in front of physicians. I will no longer work with her. It has been a difficult situation for six months, now it is untenable.

On June 5, acting at the direction of Dr. Tucker, Hollowood's supervisor delivered a letter explaining that she was terminated immediately because "[b]y your actions and behavior, you have created an atmosphere of distrust and enmity, and physicians and nurses have now refused to work with you as a result of your wrongfully disparaging their professionalism and performance." The Union promptly filed this unfair labor practice charge.

Under sections 8(a)(1) and (3),"it is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice." N.L.R.B. v. Transportation Mgmt. Corp., 462 U.S. 393, 398 (1983). Following the hearing, the Board's administrative law judge ruled that Hollowood's termination was an unfair labor practice, concluding that her television statement was protected concerted activity because it was not maliciously false, that

the Board's General Counsel "made a prima facie showing" that the statement and Hollowood's earlier activities on behalf of the Union were the motivating factors behind her discharge, and that St. Luke's stated reason for the discharge -- that adverse staff reaction had rendered Hollowood unemployable -- was not credible and therefore pretextual. The Board affirmed, ordering Hollowood's reinstatement with back pay and rejecting St. Luke's stated reason for the discharge because "the subjective feelings of Hollowood's coworkers are not a relevant consideration in determining whether [the] discharge of Hollowood was unlawful." Four legal and factual errors require us to reject the ALJ's and the Board's analysis.

First, we reject the ALJ's legal conclusion that Hollowood's public statement was protected activity unless maliciously false. Section 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), prohibits the Board from ordering the reinstatement of any employee "if such individual was suspended or discharged for cause." In N.L.R.B. v. Local Union No. 1229, IBEW, 346 U.S. 464, 477-78 (1953), the Supreme Court upheld the discharge of striking technicians who had distributed handbills on the picket line disparaging their employer's television programming:

> Even if the attack were to be treated . . . as a concerted activity wholly or partly within the scope of those mentioned in § 7, the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section, when read in the light and context of the purpose of the Act.

Applying Local 1229, we held in N.L.R.B. v. Greyhound Lines, Inc., 660 F.2d 354, 356 (8th Cir. 1981), that employee public statements are protected concerted activity "if they are directly related to an ongoing labor dispute, are not a disparagement of the Company's reputation or the quality of the Company's product, and are not maliciously motivated." (Emphasis added); accord Community Hosp. of Roanoke Valley, Inc. v. N.L.R.B., 538 F.2d 607, 610 (4th Cir. 1976) (nurse's public statements protected because true and directly related to terms and conditions of employ). These

cases establish that an employee exceeds the boundaries of protected activity when she falsely and publicly disparages her employer or its products and services. An employee may not appeal to the public by conveying information with "reckless disregard of its truth or falsity." Montefiore Hosp. & Med. Ctr. v. N.L.R.B., 621 F.2d 510, 517 (2d Cir. 1980).

In this case, we agree with the ALJ that Hollowood's public statement related to an ongoing labor dispute concerning the terms and conditions of her employ. And we accept the ALJ's finding that the statement was not malicious in the sense of being the product of an evil motive. But Hollowood clearly disparaged the quality of patient care being provided by St. Luke's in a way guaranteed to adversely affect the hospital's reputation with prospective patients and the public at large. And St. Luke's proved that the disparagement was materially false:

• Hollowood falsely stated that the changes left St. Luke's labor and delivery operating rooms understaffed because emergencies "can happen not one at a time but possibly two at a time." She knew or should have known that St. Luke's averages one emergency C-section a month and has never had to deal with two at one time.

• Hollowood falsely stated that St. Luke's had reduced the labor and delivery staffing from three RNFAs to two "and didn't allow us to do two sections at one time." There was no such prohibition, and her suggestion that two RNFAs on duty jeopardized patient care was false because there are only two labor and delivery operating rooms, one of which was always available for emergencies.

• Hollowood falsely stated that St. Luke's is "trying to . . . have one person cover what three people did two years ago." Under the new staffing procedure, three trained professionals are assigned to each C-section team, but only one is an RNFA.

-7-

• Hollowood's statement that "her replacement won't have her qualifications" was materially misleading. In June 1998, the new RNFAs did not have the same level of labor and delivery experience as the departing RNFAs, but they had the same or better training to prepare for the position, and all had extensive operating room experience. For example, Hollowood's replacement, Susan Browning, had substantial operating room experience and the same training as Hollowood.

Hollowood's June 1 statement accused St. Luke's of "jeopardizing the health of mothers and babies" by depleting its staff of labor and delivery RNFAs, reducing the effectiveness of the remaining RNFAs by increasing their duties, and providing less qualified replacements. The statement was materially false and misleading. It is contrary to the public interest, and serves no legitimate purpose of the National Labor Relations Act, to falsely declare in a televised news interview that a hospital is risking the health of its patients. We reject the Board's finding that Hollowood's televised statement to the reporter (as opposed to her other activities on behalf of the Union) was protected concerted activity. As we said in N.L.R.B. v. Red Top, Inc., 455 F.2d 721, 726 (8th Cir. 1972), "assuming arguendo that the employees were engaged in protected activity, there is a point where their methods of engaging in that activity would take them outside the protection of the Act." Accord Earle Indus., Inc. v. N.L.R.B., 75 F.3d 400, 405-07 (8th Cir. 1996).

Second, the ALJ erred in ruling that, when the Board's General Counsel presented a prima facie case that Hollowood was discharged for protected concerted activity, St. Luke's had the burden to prove that it would have discharged her anyway. The Board's General Counsel "has the burden of proving" that the employee's protected conduct was a substantial or motivating factor in the discharge. Transportation Mgmt., 462 U.S. at 401. Only if the General Counsel *proves* that anti-union animus was a motivating factor in the employer's decision to discharge does the burden shift to the employer to prove it would have made the same decision

-8-

absent the employee's protected activity. See Wilson Trophy Corp. v. N.L.R.B., 989 F.2d 1502, 1510 (8th Cir. 1993).

In this case, the difference between presenting a prima facie case and satisfying the ultimate burden of persuasion is material. Hollowood openly campaigned for the Union for months prior to the June 1 television broadcast, without adverse action by St. Luke's. O'Neil had for years been the primary union supporter among St. Luke's nurses. He appeared on the same June 1 broadcast but was not fired or otherwise disciplined.[1] These circumstances strongly support the uncontradicted testimony by numerous St. Luke's witnesses that Hollowood was terminated only because of widespread physician and staff reaction to her materially false public statement. Thus, the ALJ's misstatement of the law precludes enforcement of the Board's order.

Third, we reject the Board's legal conclusion that the reactions of Hollowood's coworkers to her false public statement "are not a relevant consideration." An employer establishes an affirmative defense by proving that a legitimate reason for the discharge would have brought about the discharge notwithstanding the General Counsel's proof of an unlawful motive. GSX Corp. v. N.L.R.B., 918 F.2d 1351, 1357 (8th Cir. 1990). Even within the bounds of otherwise protected concerted activity, an employer need not tolerate employee misconduct that is "flagrant or [that] render[s] the employee unfit for employment." Carleton College v. N.L.R.B., 230 F.3d 1075, 1081 (8th Cir. 2000) (quotation omitted). Adverse coworker reaction to

---

[1]Dr. Tucker testified that O'Neil was not disciplined because he promoted unionization without disparaging the abilities or the training of St. Luke's medical staff or the care provided its patients. Inexplicably, the ALJ cited the disparity between St. Luke's treatment of O'Neil and Hollowood as evidence of anti-union animus. In fact, it was evidence that Hollowood was not discharged because of her union activity. See N.L.R.B. v. Arkansas Grain Corp., 392 F.2d 161, 167 n.5 (8th Cir. 1968).

an employee's materially false public disparagement is relevant in applying this standard.

Fourth, substantial evidence on the record as a whole does not support the ALJ's decision to discredit St. Luke's stated reason for Hollowood's discharge. In his written decision, the ALJ rejected the above-quoted physician letters reacting to Hollowood's public statement because the physicians did not testify. Yet the letters were admitted into evidence without objection from the General Counsel's trial attorney, from the Union's attorney, or from Hollowood's attorney, and without comment by the ALJ during the hearing that physician testimony was needed. Moreover, the critical question was whether the hospital administrators credited the oral and written comments by physicians that they would not work with Hollowood after she had publicly denigrated the quality of their patient care.

Patient lives are at stake in hospital surgeries, and medical professionals are devoted to providing the highest quality patient care. Common sense teaches that patient care is directly affected by the ability of a team of physicians and nurses to work together in the confines of an operating room; that a hospital must not risk staffing the operating room with doctors and nurses who cannot work effectively together; and that surgeons cannot be expected to tolerate operating room staff who seem to be more interested in publicizing flaws in the process than in helping protect the patient. Here, Dr. Tucker testified that he made the decision to terminate Hollowood after hearing adverse physician and staff reaction to her public statement that was more widespread and extreme than any he had ever witnessed. This testimony was corroborated by numerous other hospital administrators. It is inherently credible that physicians and nurses falsely accused of "jeopardizing the health of mothers and babies" would react in this fashion. Thus, there is overwhelming evidence that St. Luke's terminated Hollowood, not because of her union activities, but because her false and disparaging public statement alienated her from her most important coworkers and made her continued employment untenable.

-10-

The Board's decision to the contrary will not be enforced because the ALJ's credibility determinations are not supported by substantial evidence and the inferences drawn by the ALJ and the Board are inherently incredible.  See Carleton College, 230 F.3d at 1078 (explaining how the substantial evidence test is applied); N.L.R.B. v. Prescott Int'l Prods. Co., 500 F.2d 6, 11 (8th Cir. 1974).

For each of the foregoing reasons, we grant St. Luke's petition for review and deny enforcement of the Board's order.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-