LOKEN, Circuit Judge,
dissenting in part.
I respectfully dissent from Parts II.A and II.B.i of the court’s opinion. I agree with the dissenting Board member that MikLin did not violate the National Labor Relations Act (“the Act”) by removing “contaminated-sandwich” posters publicly *412 displayed near its stores and by discharging employees responsible-for this damaging disparagement because they “clearly resorted to a means of protest so disloyal as to lose the Act’s protection.” MikLin Enters., Inc., 361 N.L.R.B. No. 27, at *12 (2014) (Johnson, M., dissenting in part).
A. The Board held that MikLin violated Sections 8(a)(1) and (3) of the Act when it discharged six employees “for their participation in the [contaminated-sandwich] poster campaign.” Id. at *2. The Board ordered the employees reinstated with back pay. Section 10(c) provides that the Board may not require reinstatement or order back pay for an employee who has been discharged “for cause.” 29 U.S.C. § 160(c). Section § 10(c)' “cannot mean that' an employer is at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects.” NLRB v. Wash. Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). Thus, the critical issue is whether publishing the contaminated-sandwich posters- near MikLin’s “Jim-, my John’s” sandwich shops was concerted activity protected by § 7. This issue turns on proper interpretation of the Supreme Court’s controlling decision in NLRB v. Local Union No. 1229, IBEW, 346 U.S. 464, 472, 74 S.Ct. 172, 98 L.Ed. 195 (1953)(Jefferson Standard).
In Jefferson Standard, the Court considered whether a radio station violated § 8(a)(1) when it fired technician employees because—
at a critical time in the initiation of the company’s television service, they sponsored or distributed 5,000 handbills making a sharp, public, disparaging attack upon the quality of the company’s product and its business policies, in a manner reasonably calculated to harm the company’s reputation and reduce its income.
346 U.S. at 471, 74 S.Ct. 172. The Board held that the employer had “cause” to discharge within the meaning of § 10(c), finding that the employees “deliberately undertook to alienate their employer’s customers by impugning the technical quality of his product.” Id. The Supreme Court upheld this 'decision.- “There is no more elemental cause for discharge of an employee than disloyalty to his employer,” the Court explained. Id. at 472, 74 S.Ct. 172. Absent a labor controversy, the technicians’ conduct' “unquestionably would have • provided adequate cause for their disciplinary discharge within the meaning of § 10(c).” Id. at 476, 74 S.Ct. 172. The “coexistence of a labor dispute” afforded them no defense:
■Even if-'the attack were to" be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned in § 7, the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section, when -read in the light and context of the purpose of the Act. Id. at 476-78, 74 S.Ct. 172.
Here, distributing the contaminated-sandwich posters was part of a labor" controversy, namely, the employees’ concerted activity to unionize and to obtain better working conditions, including sick pay. The Board majority recognized that, under Jefferson Standard, the employee communications could nonetheless be “so disloyal” as to be unprotected. But, noting that “Board law has developed considerably in its approach to the question of employee disloyalty,” 361 N.L.R.B. No. 27, at *5 n. 18, the Board applied a restrictive standard that effectively gutted'the Supreme Court’s governing disloyalty principle:
To lose the Act’s protection as an act of disloyalty, an employee’s public criticism of -an employer must evidence a mali *413 cious motive. (M at *4, quotation omitted.)
Even communications that raise highly sensitive issues such as public safety have been found protected where they are sufficiently linked 'to a legitimate labor dispute and are not maliciously motivated to harm the employer. (Id. at *4-5.)
Here, where ... the posters’ message was closely tied to the employees’ inters est in obtaining sick days, the labor dispute is made clear in the posters, and the posters were not shown to be maliciously untrue, the posters ai’e protected. (Id. at *5 n. 18.)
In a significantly different labor law context, the Board has long held that a defamatory false statement made during a labor dispute does not lose § 7 protection unless made with “actual malice.” See Jolliff v. NLRB, 513 F.3d 600, 610 (6th Cir.2008). In this defamation context, the Board defines malice “as a shorthand expression of the ‘knowledge of falsity or reckless disregard of the truth’ standard,” not “malice in the common-law sense — as ‘hatred, personal spite, ill will, or desire to injure.’ ” Nat’l Ass’n of Letter Carriers v. Austin, 418 U.S. 264, 281, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (emphasis added). By adopting this narrow definition of malice as an element of the Jefferson Standard inquiry, the Board effectively removed from the inquiry the central § 10(c) issue as defined by the Supreme Court — disloyalty.
In Jefferson Standard, the Court -explained that the disparaging statements lost the Act’s protection due to “the means used by the technicians.” 346 U.S. at 477-78, 74 S.Ct. 172. The Court described the disloyal statements as “a sharp, public, disparaging attack ... reasonably calculated to harm the company’s reputation and reduce its income,” and as a deliberate effort to alienate their employer’s customers by impugning the technical quality of its product. Id. at 471, 74 S.Ct. 172. The Court never mentioned malice, a term that has different meanings in different legal contexts. But its characterization of the employees’ intentwasan obvious reference to malice in the common law sense, which includes desire to injure.
Our prior cases confirm that an employee’s disloyal statements can lose § 7 protection without a showing of actual malice as' .the Board has defined it. In NLRB v. Red Top, Inc., we held that a threat by employees to divulge damaging information was unprotected because it was- “an act of disloyalty to the employer’s business interests.” 455 F.2d 721, 727 (8th Cir.1972). And in St. Luke’s Episcopal-Presbyterian Hospitals, Inc. v. NLRB, we expressly rejected the contention that public-disparagement of an employer “was protected activity unless maliciously false.” 268 F.3d 575, 579 (8th Cir.2001). In St. Luke’s, a hospital discharged a nurse who went on local television and accused her employer of “jeopardizing the health of mothers and babies” by altering shift assignments and responsibilities. Id. at 577. We explained that'cases interpreting Jefferson Standard “establish that an employee exceeds the boundaries of protected activity when she falsely and publicly disparages, her-employer, or its products and services.” Id. at 580. In reversing the Board, we concluded that the nurse was not wrongfully discharged “because her false and disparaging public statement alienated her from her most important coworkers and made her continued employment untenable.” Id. at 582.
By requiring proof that disloyal conduct be the product of a malicious motive, as narrowly defined, the Board fundamentally misinterpreted both Jefferson Standard and-our decisions construing and applying *414 Jefferson Standard. This is an issue of law we review de novo. See NLRB v. U.S. Postal Serv., 660 F.3d 65, 68 (1st Cir.2011); N.Y. N.Y., LLC v. NLRB, 313 F.3d 585, 590 (D.C.Cir.2002); accord Owen v. Bristol Care, Inc., 702 F.3d 1050, 1054 (8th Cir.2013). I would deny enforcement for this reason alone.
B. Turning to the merits of this case, I acknowledge that applying Jefferson Standard’s disloyalty principle is often difficult. Section 7 protects efforts by employees and unions to seek public support for their concerted activities, and public complaints about working- conditions frequently implicate sensitive issues such as product and workplace safety. See Misericordia Hosp. Med. Ctr. v. NLRB, 623 F.2d 808, 814 (2d Cir.1980) (public criticisms “were a necessary” and “a responsible attempt to remedy” a grievance). The Supreme Court in Jefferson Standard recognized that its decision would apply only to egregious acts of employee disloyalty; it noted the Board’s judgment that the employee tactics at issue “were hardly less ‘indefensible’ than acts of physical sabotage.” 346 U.S. at 477, 74 S.Ct. 172. Recognizing the disloyalty principle is limited to extreme cases, I have no difficulty concluding that MikLin had good cause to fire the six employees.
After losing a union-representation election, pro-union employees delivered an ultimatum to MikLin — provide paid sick leave or we will launch a publicity campaign claiming MikLin is serving its customers contaminated sandwiches. When management balked, the employees acted, launching “a sharp, public, disparaging attack upon the quality of the company’s product.” Jefferson Standard, 346 U.S. at 471, 74 S.Ct. 172. First, they hung posters in MikLin stores displaying a sandwich “made by a sick Jimmy John’s worker.” The poster asked whether the viewer could tell whether the sandwich was contaminated and warned: “we hope your immune system is ready because you’re about to take the sandwich test.” Next, the employees issued a press release to over one hundred media outlets around the country titled “Jimmy John’s Workers Blow the Whistle on Unhealthy Working Conditions.” The opening paragraph declared, “As flu season continues, the sandwich makers at this 10-store franchise are sick and tired of putting their health and the health of their customers at risk.” An attachment accused MikLin of “putfting] ... customers at risk in the name of pinching pennies.” When MikLin did not accede to the demand that it meet with a union committee and negotiate the sick pay issue, the employees posted hundreds of the contaminated-sandwich posters within two blocks of MikLin’s Minneapolis sandwich shops. This version asked people to call Robert Mulligan, MikLin’s owner, “to let him know you want healthy workers making your sandwich.”
The employees structured this attack to have the maximum adverse effect on Mik-Lin’s reputation and income. They chose March as a “good time” to launch the attack “because it was flu season.” They issued a national press release, even though them dispute was with a local Jimmy John’s franchisee. Instead of naming MikLin in the posters, they named Jimmy John’s, embroiling the entire enterprise in their local dispute, including the many Jimmy John’s shops in the Twin Cities not owned by MikLin. This was not publicity “narrowly tailored to effectuate the [employees’ concerted] aims.” Five Star Transp., Inc. v. NLRB, 522 F.3d 46, 54 (1st Cir.2008). Rather, the employees selected and disseminated a message that would “hit the employer where it would hurt, by interfering with its business relations with its customers.” Red Top, 455 F.2d at 727. And the fear-mongering at *415 tack worked as designed. Robert Mulligan testified that he was “bombarded by” calls and text messages from customers who “were scared to eat at Jimmy John’s.”
Employee allegations that a food industry employer is selling contaminated products are likely to have a devastating impact. As the D.C. Circuit explained:
[W]hen a union claims that a food product produced by a struck company is actually tainted it can be thought to be using the strike equivalent of a nuclear bomb; the unpleasant effects will long survive the battle. The company’s ability to sell the product, even if the strike is subsequently settled, could well be destroyed. If a customer becomes apprehensive to bite into Diamond’s walnuts because of a concern at finding an impurity (even part of a worm), it is unlikely that a strike settlement will eliminate that visceral fear.
Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259, 1267 (D.C.Cir.1997) (en banc) (citation omitted), cert. denied, 523 U.S. 1020, 118 S.Ct. 1299, 140 L.Ed.2d 466 (1998). Here, the employees’ posters graphically told customers (i) that Mik-Lin’s sandwich makers were working when they are sick (“Shoot, we can’t even call in sick”), and (ii) that sandwiches made when they are sick will be contaminated (“we hope your immune system is ready”). Thus, from the array of possible tactics, the employees selected a tactic sure “to harm [MikLin’s] reputation and reduce its income.” Jefferson Standard, 346 U.S. at 471, 74 S.Ct. 172. The Act does not protect such calculated, devastating attacks upon an employer’s reputation and products. See Endicott Interconnect Techs., Inc. v. NLRB, 453 F.3d 532, 537 (D.C.Cir.2006); accord Coca Cola Bottling Works, Inc., 186 N.L.R.B. 1050, 1054 (1970) (finding employee “Health Warning” leaflet unprotected because “the main thrust of the leaflet was to create fear in the public’s mind that drinking Coca Cola would be harmful to the health of the purchaser because of the presence of foreign objects such as roaches and mice in the bottle”).[9]
Significantly, the employees’ scare message was deliberately false. They knew MikLin required its employees to call in sick if they had experienced flu-like symptoms in the last 24 hours, as Minnesota Department of Health regulations required. The record is full of examples of MikLin providing time off to sick employees. In addition, the posters grossly exaggerated the danger of eating a MikLin sandwich. Over the employer’s ten-year history, when its ten stores served eight million sandwiches, the Department of Health investigated just two reports of gastrointestinal illness among MikLin’s employees or customers, in January 2006 and January 2007. As the ALJ noted: “Given [MikLin’s] record over a 10-year period one could regard the risk of becoming ill by eating at one of [its] shops to be infinitesimal.” MikLin, 361 N.L.R.B. No. 27, at *23. The employees’ decision to portray an infinitesimal risk as a clear and present threat to customers was recklessly misleading, suggesting a predominant intent to harm MikLin in the wake of their unsuccessful union election, not an appeal for public support. See St. Luke’s, 268 F.3d at 580-81.
Moreover, the dramatic poster allegations of food contamination were not necessary to aid the employees’ labor dispute. As the ALJ noted, “there has been no direct correlation established between these incidents and the absence of sick *416 leave.” MikLin, 361 N.L.R.B. No. 27, at *23. Rather, thé employees punished MikLin by urging customers riot to buy its sandwiches out of an unwarranted fear of becoming ill. See Montefiore Hasp. & Med. Ctr. v. NLRB, 621 F.2d 510, 517 (2d Cir.1980).
The employees’ misleading contaminated-sandwich allegations were both devastating to MikLin’s business and unnecessary to advance their concerted activity. This is precisely the type of “detrimental disloyalty” that falls outside the protection of § 7. As Board Member Johnson stated, “Any employee who is willing to make up allegations out of whole cloth against his or her employer is obviously far more disloyal, in any meaningful.sense of that word, then one who acts upon a reasonable but mistaken belief.” 361 N.L.R.B. No. 27, at *12 (Johnson, M., dissenting in part). Because the publicity campaign was unprotected activity, MikLin did not violate the Act by discharging employees responsible for the disloyal public campaign, and by urging employees on an employee-created Anti-Union Facebook page to remove the disparaging posters from public property near where they worked. See Jefferson Standard, 346 U.S. at 478, 74 S.Ct. 172; Endicott, 453 F.3d at 538.
For these reasons, I respectfully dissent from Parts II.A and II.B.i of the court’s opinion. I join Parts II.B.ii and ILB.iii for the reasons stated.

. The Board did not cite Diamond Walnut Growers or St. Luke’s, the most relevant circuit court authorities, It dismissed Coca Cola as Board precedent that "has been implicitly overruled." MikLin, 361 N.L.R.B. No. 27, at *5 n. 18.