2025 IL App (2d) 250271-U
No. 2-25-0271
Order filed September 9, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| TRANSITIONAL CARE OF LAKE COUNTY, LLC, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 25-LA-251 |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES COUNCIL 31, | ) ) ) ) | Honorable Joseph V. Salvi, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) We have jurisdiction to hear plaintiff's appeal; (2) The trial court did not err in denying plaintiff a preliminary injunction because it was an unconstitutional prior restraint on defendant's free speech rights.

¶ 2    Plaintiff, Transitional Care of Lake County, LLC, sued defendant, American Federation of State, County and Municipal Employees, Council 31, for statements made by defendant after breakdowns in collective bargaining agreement (CBA) negotiations between the parties. Plaintiff sought a preliminary injunction to prevent further alleged business disparagement in violation of

the Uniform Deceptive Trade Practices Act (Act) (815 ILCS 510/1 *et seq.* (West 2024)). The trial court denied the motion for a preliminary injunction and plaintiff appealed. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4     The following facts are drawn from the allegations in plaintiff's verified first amended complaint, which we take as true for purposes of this appeal. See *Smith v. Department of Natural Resources*, 2015 IL App (5th) 140583, ¶ 23.

¶ 5     Plaintiff owned a personalized medical rehabilitation facility in Mundelein called Thrive of Lake County (Thrive). Defendant is a trade union whose members are employed by plaintiff in clinical, clerical, and resident services roles. The parties were most recently bound by a CBA that was negotiated in 2021 and effective until March 31, 2024.

¶ 6     In 2022, the parties negotiated a memorandum of understanding (MOU) that, among other things, set staffing ratios relative to resident counts for nurses and nurse aides that worked in the memory care and long-term care units at Thrive. However, after several months the MOU became financially and logistically inviable. Plaintiff said that the MOU limited its ability to reassign nursing staff between units if one unit had a higher-than-normal level of acuity while another had a lower-than-normal level of acuity. As a result, the parties negotiated a new MOU in 2023, which set a fixed number of nurses and nurse aides, rather than a ratio relative to resident count.

¶ 7     In 2024, the parties agreed to new CBA terms. According to plaintiff, the agreed-upon procedure to formalize this agreement was for defendant to prepare a final draft of the CBA and send it to plaintiff for its review and final agreement to the terms, after which the CBA would be ready for the parties to ratify. For defendant, the ratification process required a vote of a majority of its members in favor of adopting the CBA. Plaintiff alleges that defendant did not follow this process but unilaterally altered the proposed CBA terms by adding the staffing ratio from the 2022

MOU. Defendant also allegedly submitted the altered proposed CBA for member votes without first sending it to plaintiff for approval. As a result of this, the CBA negotiations came to a halt.

¶ 8 On March 18, 2025, defendant posted a billboard on State Route 83 west of U.S. Highway 45 in Mundelein. According to the complaint, every week over 200,000 vehicles passed through this intersection, which was about a quarter mile from the entrance to Thrive. The billboard featured a picture of an older man who appears to be asking "IS thrive SAFE?" with the word "thrive" appearing in the same font used on Thrive's marketing materials. The billboard also instructs readers to "Tell Ignite/Thrive: Safe Staffing Now!" with a URL for "IsThriveSafe.com." (Ignite Medical Resorts is Thrive's operating company.) The billboard also featured defendant's logo in the bottom left corner. According to the record, the billboard was taken down sometime before May 12, 2025.

¶ 9 When one visited the website, the page was redirected to a petition. At the top was defendant's logo with the title "Add Your Name: Safe Staffing at Thrive" below it. The website offered the ability to "Sign This Petition" with the "Target" listed as "Thrive of Lake County/Ignite Medical Resorts." It provided fields for users to fill in their name, email, zip code and comments. The website also republished the billboard and featured text that said:

> "For years, Thrive of Lake County employees have put resident care first by insisting that their union contract include safe-staffing ratios that improve resident health and outcomes. Last year, Thrive management agreed to a new contract that maintains these ratios—but the nursing home and its operating company, Ignite Medical Resorts, have since refused to sign or implement the agreement.

That's illegal. And it's especially concerning because nursing homes with private equity and real estate investment trust investors—like Thrive of Lake County—tend to have lower staffing, worse care and higher resident-mortality rates."

Below the text, the website said that it was sponsored by defendant. The website included a petition at the bottom, which stated:

"To: Thrive of Lake County/Ignite Medical Resorts

From: [Your Name]

We the undersigned call on Thrive of Lake County/Ignite Medical Resorts to prioritize residents not profits, immediately honor the collective bargaining agreement negotiated with its employees represented by AFSCME Local 2452, and maintain the contract's safe-staffing provisions. We will not accept corners being cut to increase corporate profits while diminishing quality of care. Thrive/Ignite should respect its employees, value their work, and immediately sign and implement their union contract."

¶ 10 Based on these allegations, plaintiff sued for violations of the Act, commercial disparagement, defamation *per se*, defamation *per quod*, and false light. Plaintiff alleges that defendant falsely claimed on the billboard and website that plaintiff does not have safe staffing levels, its staffing levels are illegal, plaintiff wants to continue to maintain the illegal and unsafe staffing levels, plaintiff agreed to a CBA with defendant regarding the staffing ratios, it was illegal for plaintiff to not sign the CBA, plaintiff's staffing levels resulted in worse care and higher resident mortality rates, and plaintiff was prioritizing profits over the safety of residents. Plaintiff says that its staffing levels met or exceeded the minimum staffing levels imposed by Illinois and federal law. As a result of defendant's actions, plaintiff alleges that its resident count declined and it lost revenue.

¶ 11    Plaintiff also filed a motion for a temporary restraining order (TRO) or preliminary injunction under the Act.  Plaintiff sought to enjoin defendant from continuing to publish the website and making any further disparaging statements about plaintiff.  While the motion was being briefed by the parties, plaintiff received a letter from defendant signed by local public officials, including state senators, representatives, and county board members.  The letter implored plaintiff to honor the new CBA that was negotiated with defendant.  It noted that one of defendant's top priorities in negotiating was "maintaining the contract's safe-staffing ratios, which studies show improve patient health and outcomes."  The letter also stated that plaintiff's "refusal to implement the contract is against the law.  It's especially concerning in light of the demonstrated track record of lower staffing, worse care and higher patient-mortality rates among nursing homes with private equity and real estate investment trust investors, like Thrive and Ignite."  Plaintiff maintained that this letter is "conclusive proof that an injunction must issue" because defendant continues to make the allegedly defamatory and disparaging statements.

¶ 12    Following a non-evidentiary hearing, the trial court denied plaintiff's motion.  Although the trial court found that plaintiff established all the elements required for a preliminary injunction, it ruled that such an injunction would violate the defendant's constitutional right to free speech.  The trial court explained that the basis for this conclusion was because the speech was not commercial speech and defendant was not a competitor to plaintiff.  Plaintiff appealed.

¶ 13                                    II. ANALYSIS

¶ 14    Before proceeding to the merits, we must address our jurisdiction.  Defendant contends that we lack jurisdiction because plaintiff was seeking a TRO in the trial court, which requires that a petition for review be filed within two days of the denial of the TRO.  Ill. S. Ct. R. 307(d)(1) (eff. Nov. 1, 2017).  Plaintiff initially appealed by filing a petition under Rule 307(d)(1), docketed

in this court as No. 2-25-0267. However, the petition was filed three days after the denial of the TRO in the trial court. See *Nizamuddin v. Community Education in Excellence, Inc.*, 2013 IL App (2d) 131230, ¶ 10 (noting that a petition for review under Rule 307(d)(1) must be filed within two days after the entry of a TRO-related order). Plaintiff dismissed the first appeal and filed this appeal under Rule 307(a) as the denial of a preliminary injunction. Defendant argues that an appeal of a preliminary injunction is improper here because plaintiff was primarily seeking a TRO and the trial court did not hold an evidentiary hearing for a preliminary injunction, thus Rule 307(d)(1) was the sole avenue for an appeal of the trial court's order.

¶ 15    To determine our jurisdiction over an injunction under Rule 307, we look to the substance of the motion, not the form. See *Doe v. Northwestern Memorial Hospital*, 2014 IL App (1st) 140212, ¶ 29. While plaintiff's motion was styled as one for a TRO or preliminary injunction, the relief sought makes clear that plaintiff was seeking a preliminary injunction. Plaintiff's motion sought an injunction "during the pendency of this lawsuit." A TRO, however, lasts for only a brief duration. See *County of Boone v. Plote Construction, Inc.*, 2017 IL App (2d) 160184, ¶ 28. Conversely, a preliminary injunction "is not necessarily of extremely brief duration since its primary purpose is to provide relief to an injured party and maintain the status quo until a trial on the merits." *Id.* Further, the trial court allowed briefing by both parties and held oral arguments on plaintiff's motion. We have held that a TRO entered under these circumstances "is the functional equivalent of a preliminary injunction." *Id.* Thus, the substance of the motion shows that plaintiff was seeking a preliminary injunction.

¶ 16    Additionally, although plaintiff initially attempted to appeal under Rule 307(d)(1), "the purpose of Rule 307(d) *** is 'to provide an expedited appeal process due to the nature of the [TRO], an emergency remedy granted on a summary showing by the movant.' " *Nizamuddin*,

2013 IL App (2d) 131230, ¶ 10 (quoting *Friedman v. Thorson*, 303 Ill. App. 3d 131, 136 (1999)). Plaintiff now does not seek that expedited process and proceeds solely under the standards applicable to a preliminary injunction. While defendant maintains the sought after injunction could not be a preliminary injunction because no evidentiary hearing was held, an evidentiary hearing is only required when a defendant files an answer denying material allegations in the complaint. *Rosario D. Salerno's Sons, Inc. v. Butta*, 263 Ill. App. 3d 42, 46 (1994). Here, however, defendant did not file an answer to the complaint prior to the non-evidentiary hearing on plaintiff's motion. Therefore, defendant's argument that we lack jurisdiction is unconvincing.

¶ 17 Turning to the merits, plaintiff argues on appeal that the trial court erred in denying it a preliminary injunction as unconstitutional under the state and federal constitutions. The purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits of a case. *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk and Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001). "[A] preliminary injunction [is] an extreme remedy which should be employed only in situations where an emergency exists and serious harm would result if the injunction is not issued." *Id.* The party seeking a preliminary injunction must demonstrate: (1) a clearly ascertainable right in need of protection exists; (2) it will suffer irreparable harm without the injunction; (3) no adequate remedy at law for the injury exists; and (4) the likelihood of success on the merits. *Id.* To show a likelihood of success on the merits, the party seeking the preliminary injunction need only " 'raise a fair question as to the existence of the right which [it] claims and lead the court to believe that [it] will probably be entitled to the relief requested if the proof sustains [its] allegations.' " *Fox Fire Tavern, LLC v. Pritzker*, 2020 IL App (2d) 200623, ¶ 22. The Act authorizes injunctive relief to enforce its provisions (815 ILCS 510/3 (West 2024)), thus "the

general rules of equity requiring a showing of a lack of an adequate remedy at law and irreparable injury need not be shown." *County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 634 (2005).

¶ 18    Generally, we review a trial court's grant or denial of a preliminary injunction for an abuse of discretion. *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378 (2010).   A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.  However, where, as here, the trial court does not make any factual findings and instead rules on a question of law, our review is *de novo*. *Clinton Landfill*, 406 Ill. App. 3d at 378; see *Du Page County Airport Authority v. Department of Revenue*, 358 Ill. App. 3d 476, 484 (2005) (noting that questions of constitutional interpretation are reviewed *de novo*).

¶ 19    Both the federal and state constitutions protect the right to free speech.  See U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4.  The first amendment applies to the states through the fourteenth amendment.  *People v. Austin*, 2019 IL 123910, ¶ 30.  Our supreme court has long held that our state constitution provides broader protections to the right to free speech than the first amendment.  See *People v. DiGuida*, 152 Ill. 2d 104, 121 (1992) (the free speech provision of the 1970 Illinois constitution provides broader protection than the first amendment); *Montgomery Ward & Co. v. United Retail, Wholesale & Department Store Employees of America, C.I.O.*, 400 Ill. 38, 446 (1948) (the free speech provision of the 1870 Illinois constitution provides broader protection than the first amendment); *City of Blue Island v. Kozul*, 379 Ill. 511, 520 (1942) (same).  However, not all speech is of equal importance and afforded the same free speech protections. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).  One category of lesser-protected speech is commercial speech, which the U.S. Supreme Court has defined as speech which does "no more

than propose a commercial transaction." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976); see *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 482 (1989). Additionally, although defamatory statements are not generally constitutionally protected (*U.S. v. Alvarez*, 567 U.S. 709, 717 (2012)), they may still enjoy constitutional protection as an expression of opinion (*Hadley v. Doe*, 2015 IL 118000, ¶ 33).

¶ 20 The preliminary injunction plaintiff seeks—requiring defendant to take down its website and refrain from making any further disparaging statements about plaintiff—represents a prior restraint on speech. A prior restraint is a "predetermined judicial prohibition restraining specified expression." *In re A Minor*, 127 Ill. 2d 247, 264 (1989). Prior restraints are considered the most serious and least tolerable infringement on the right to free speech. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Thus, while prior restraints are not unconstitutional *per se*, there is a "heavy presumption" against their constitutional validity. *Kemner v. Monsanto Co.*, 112 Ill. 2d 223, 243 (1986). The party seeking the prior restraint "carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). However, the right to free speech is not absolute and "[t]he phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441 (1957). Our supreme court has determined that for a prior restraint to pass constitutional muster, it must "either contain certain specified procedural safeguards" or it "must fall within one of several narrowly defined exceptions to the doctrine." *In re A Minor*, 127 Ill. 2d at 265. "Subsequent civil or criminal proceedings, rather than prior restraints, ordinarily are the appropriate sanction for calculated defamation or other misdeeds in the First Amendment context." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994).

¶ 21    The first step in analyzing a prior restraint is determining whether it was a content based or content neutral restraint. *Same Condition, LLC v. Codal, Inc.*, 2021 IL App (1st) 201187, ¶ 33. A content-based restraint is presumptively unconstitutional and is reviewed under strict scrutiny. *Reed v. Town of Gilbert*, 476 U.S. 155, 163-64 (2015). A restraint is content based if it restricts "particular speech because of the topic discussed or the idea or message expressed." *Id.* A content-neutral restriction limits the time, place, or manner of speech and is reviewed under intermediate scrutiny. *City of Chicago v. Alexander*, 2017 IL 120350, ¶ 66. Here, the restraint is content-based because it seeks to prohibit speech based on its subject matter. We therefore consider whether the injunction plaintiff sought is narrowly tailored to serve a compelling government interest. See *Flood v. Wilk*, 2019 IL App (1st) 172792, ¶ 43.

¶ 22    In *Montgomery Ward*, our supreme court considered the circumstances under which allegedly defamatory statements may be subject to a prior restraint. 400 Ill. at 41. The court first observed that, to obtain a pretrial injunction, the plaintiff "must bring itself within the exceptions to two general principles denying injunctive relief from publishing defamatory matters." *Id.* at 42. Those two general principles were "that equity does not have jurisdiction to enjoin the commission of crimes and libels" and "the constitutional guaranty of free speech as a general rule prohibits both the courts and the legislature from putting previous restraints on publications." *Id.* The court noted several exceptions to these general principles, including where the defamatory statements are used as coercion in connection with picketing, or connected with violence or the injuring of property, or when used in connection with other activities that affect property rights. *Id.* at 45.

¶ 23    The court also discussed the "trade libels" exception to prior restraints on speech. *Id.* at 48. It distinguished defamation from trade libel because defamation "is concerned with interests of personality" while trade libel was disparagement and concerned "interests in property." *Id.* at

49. It noted that "cases involving only trade disputes [do] not support the proposition that opprobrious or scurrilous epithets concerning an employer, or the supervising officials of the employer, constitute a trade libel, *which in its essence requires some statement of a competitor or business rival*, which will take away business and give it to another." (Emphasis added.) *Id.* at 51.

¶ 24   In *Keefe*, the plaintiff, a real estate broker, sought to enjoin the defendant, a community organization, from making allegedly defamatory statements about his real estate practices. 402 U.S. at 416. The trial court entered a temporary injunction enjoining the defendant "from passing out pamphlets, leaflets or literature of any kind, and from picketing, anywhere in the City of Westchester, Illinois." *Id.* at 419. The United States Supreme Court determined that such an injunction was prohibited by the first amendment and vacated the trial court's order. *Id.* at 420. The Court first noted that "[i]t is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication." *Id.* at 418. It rejected the plaintiff's argument that the literature was not protected by the first amendment because the defendant intended for it to have a coercive impact, stating:

> "The claim that the expressions were intended to exercise a coercive impact on [the plaintiff] does not remove them from the reach of the First Amendment. [The defendant] plainly intended to influence [the plaintiff's] conduct by their activities; this is not fundamentally different from the function of a newspaper. [Citation.] [The defendant was] engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of [the defendant] are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability." *Id.* at 419.

The Court noted the heavy presumption against the constitutionality of prior restraints and concluded:

"No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court. Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record. *** [The plaintiff] is not attempting to stop the flow of information into his own household, but to the public. Accordingly, the injunction issued by the Illinois court must be vacated." *Id.* at 419-20.

¶ 25 Recently, the First District applied *Montogomery Ward* and *Keefe* to a case involving a claim for commercial disparagement under the Act. *Same Condition*, 2021 IL App (1st) 201187, ¶ 40. There, the plaintiff hired the defendant to help create a medical patient-centered software application. *Id.* ¶ 4. The defendant delivered the program several months late and below the expectations of the plaintiff. *Id.* Thereafter, the plaintiff made several internet posts regarding the defendant's performance and business integrity. *Id.* ¶ 6. The plaintiff sued the defendant for breach of contract, fraud, and unjust enrichment. *Id.* ¶ 5. The defendant counterclaimed for breach of contract, defamation, and commercial disparagement under the Act. *Id.* ¶ 6. Throughout the litigation, the plaintiff continued to make numerous internet posts about the defendant, and even created a website dedicated to its views about the defendant. *Id.* ¶¶ 7-12. The defendant sought a temporary restraining order and a preliminary injunction to remove the posts and stop future alleged defamatory statements. *Id.* ¶¶ 12, 16. The trial court denied the motions but, pursuant to

the court's inherent authority to manage its cases, prohibited the plaintiff from making future online posts about the defendant. *Id.* ¶ 17.

¶ 26     On appeal, the plaintiff argued that the trial court's order amounted to an unconstitutional prior restraint of its right to free speech. *Id.* ¶ 27.  The appellate court agreed.  It noted that the trial court's order amounted to a blanket content-based prior restraint and there was a heavy presumption that it was unconstitutional. *Id.* ¶ 38.  The court also determined that none of the "very limited exceptions in which an injunction is available to prevent actual or threatened publications of defamation" under *Montgomery Ward* were applicable. *Id.* ¶ 40.  It reasoned that the "trade libel" exception did not apply because the two companies were not competitors as they operated in different sectors and once did business with each other. *Id.*  The court stated that "the injunctive power of the judiciary cannot be used to silence critics of the business practices of another." *Id.* ¶ 50.  Therefore, the court vacated the trial court's order prohibiting the plaintiff from posting about the defendant. *Id.* ¶ 53.

¶ 27     Here, no exception to the general rule against prior restraints recognized in these cases applies.  First, there is no picketing or strike involved.  In fact, plaintiff specifically alleges in its complaint that defendant held a vote to strike but the vote failed.  Second, plaintiff and defendant are not competitors.  Defendant is not using its speech in an attempt to draw business away from plaintiff and to defendant.  Rather, defendant is using its collective voice during CBA negotiations to comment on plaintiff's business practices and negotiating tactics to gain public support.  As noted by the court in *Same Condition*, "the injunctive power of the judiciary cannot be used to silence critics of the business practices of another." *Id.* ¶ 50.  Though defendant's speech and actions may be off-putting to some, as plaintiff's actions may be too, it is not outside the significant scope of the free speech protections afforded by the state and federal constitutions.  See *Keefe*, 402

U.S. at 419. Of course, whether plaintiff is entitled to a permanent injunction because defendant's statements are ultimately adjudicated to be commercial disparagement is subject to different considerations. See *Same Condition*, 2021 IL App (1st) 201187, ¶ 42 ("there is an important difference between a prior restraint as a preventative measure before trial, as occurred in this case, and a prior restraint as a posttrial remedy to prevent the repetition of statements judicially adjudicated to be defamatory").

¶ 28    Moreover, the relief plaintiff seeks—fully removing defendant's website and prohibiting any further defamatory speech—is not narrowly tailored to achieve a compelling government interest. This would operate as a blanket prior restraint on defendant's speech and stop the spread of information to the public. This could lead to the chilling effect of defendant not being able to speak publicly whatsoever on the topic of its labor dispute with plaintiff. Similar to the trial court's order in *Same Condition*, this overbroad relief cannot be reconciled with the principles prohibiting prior restraints of speech before the merits of the statements have been adjudicated.

¶ 29    Plaintiff's argument that defendant's statements are commercial speech not entitled to full free speech protections is unavailing. When deciding if speech is commercial, appropriate considerations include whether the speech is an advertisement, the speech refers to a specific product, and the speaker has an economic motivation for the speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-67 (1983). Not all these considerations must be met for speech to be considered commercial speech. *Id.* at 67 n.14. With respect to the latter consideration, plaintiff focuses on its perceived belief that defendant had an economic motivation for the speech: defendant is trying to earn more money for its union members. But "the fact that [defendant] has an economic motivation *** would clearly be insufficient by itself to turn the [speech] into commercial speech." *Id.* at 67.

¶ 30    The remaining considerations also do not weigh in favor of commercial speech. Defendant's speech was not an advertisement because it was not selling or promoting any product or service. The speech also does not otherwise reference a specific product or propose a commercial transaction. See *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, 485 U.S. 568, 576 (1998) (handbills expressing the benefits of unionism "do not appear to be typical commercial speech such as advertising the price of a product or arguing its merits"). Rather, it was speech raising issue with plaintiff's staffing and negotiation tactics during a labor dispute. While that necessarily involves economic considerations, it is not commercial speech under the Supreme Court's precedents. See, *e.g.*, *Virginia State Board of Pharmacy* 425 U.S. at 762 ("The interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome.").

¶ 31    Plaintiff's attempts to inject the standards for claims under the Act into our constitutional analysis are unavailing. While plaintiff is correct that the Act does not require the parties to be competitors (815 ILCS 510/2(b) (West 2024)) and requires an allegedly deceptive statement to be made "in the course of [a defendant's] business, vocation, or occupation" (*id.* § 2(a)), this does not alter the constitutional analysis discussed above. To implement these statutory standards into our constitutional analysis would require us to improperly depart from our supreme court's precedent. See *People v. Moeller*, 2024 IL App (2d) 230043, ¶ 150 ("This court is bound to faithfully follow and apply judicial precedents established by our supreme court.").

¶ 32    Further, plaintiff's citation to cases involving the federal Lanham Act is inapposite, as those cases involve considerations not present here. For example, in *Coca-Cola Co. v. Purdy*, the U.S.

Court of Appeals for the Eight Circuit noted that the defendant did not have a first amendment right to use the plaintiff's trademarks to "spread his protest message by confusing Internet users into thinking that they are entering one of the plaintiffs' websites." 382 F.3d 774, 788 (8th Cir. 2004). Further, in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, the U.S. Court of Appeals for the Second Circuit noted that the Lanham Act's prohibitions are content neutral and there were numerous other ways in which the defendant could broadcast the content of its speech without infringing upon the plaintiff's trademark. 604 F.2d 200, 207 (2d Cir. 1979). Here, by contrast, there are no allegations that defendant was tricking the public into believing that its allegedly disparaging statements were being broadcast by plaintiff. Instead, defendant very clearly identified itself as the broadcaster of the speech. Additionally, the sought after injunction was content-based and there would be no other way for defendant to broadcast the content of its speech if the injunction was entered. Simply put, the reasoning of the Lanham Act cases is unpersuasive in this case.

¶ 33    Finally, many of the cases cited by plaintiff were on appeal following a resolution on the merits. For example, in *St. Luke's Episcopal-Presbyterian Hospitals, Inc. v. National Labor Relations Board*, the court reversed the finding of the National Labor Relations Board (NLRB) that disparaging statements about a hospital's safety was made by an employee of the hospital were protected concerted activity under the National Labor Relations Act. 268 F.3d 575, 577-79 (8th Cir. 2001). The court determined the statements were proven to be materially false before the NLRB and, therefore, not entitled to protection. *Id.* at 581. As noted above, there are different constitutional considerations regarding the propriety of an injunction after allegedly disparaging statements are proven to be false on the merits. See *Same Condition*, 2021 IL App (1st) 201187, ¶ 42.

¶ 34    Accordingly, the trial court was correct to deny the overbroad preliminary injunction sought by plaintiff.

¶ 35                                III. CONCLUSION

¶ 36    For the reasons stated, the interlocutory order of the circuit court of Lake County is affirmed.

¶ 37    Affirmed.